NASHVILLE, C. & ST. L. RY. *v.* BROWNING *et al.*, CONSTITUT-
ING STATE BOARD OF EQUALIZATION.*

(*Nashville,* December Term, 1939.)

Opinion filed December 16, 1940.
Rehearing Denied January 20, 1940.
Designated for publication, June 10, 1940.

---

*Affirmed 310 U. S. 362, 84 L. Ed. 1254, 60 S. Ct. 968.

W. H. Swiggart, Seth M. Walker, Edwin F. Hunt, and W. A. Miller, all of Nashville, for plaintiff in error.

Roy H. Beeler, Attorney-General, and W. F. Barry and Dudley Porter, Jr., Assistant Attorneys-General (William Gerber and Frank H. Gailor, and James J. Pleasants, Jr., all of Memphis, W. C. Cherry and Horace Osment, both of Nashville, and J. W. Anderson and T. S. Myers, both of Chattanooga, of counsel), for defendants in error.

Mr. Justice DeHaven delivered the opinion of the Court.

The Nashville, Chattanooga & St. Louis Railway filed a petition for *certiorari* and *supersedeas* in the Circuit Court of Davidson County to review the action of the State Board of Equalization in fixing the value of petitioner's property for taxation. The trial judge dismissed the petition and an appeal has been taken to this court.

The Railroad and Public Utilities Commission is directed by statute (Code, sec. 1508) to assess for taxation, for State, county and municipal purposes, all of the property of every description, tangible and intangible, within the State, belonging to railroad companies and other named public utilities. It is provided that the Commission shall assess all of such property biennially, in even years, at its actual cash value as of the same date the properties of other persons are by law assessed. The

owners of property assessable under the statute are required by Code, sec. 1509, to file with the Commission sworn schedules and statements of certain information.

Section 1526 of the Code is as follows: "Upon examination of every such schedule and statement and all other evidence taken by them, the said commission shall proceed to ascertain and determine the value of said property within the state for taxation and assess the same accordingly, taking into consideration the capital stock, corporate property, franchises, and gross receipts, the market value of the shares of stock and bonded indebtedness, and such other evidence as is afforded by said statements and schedules or other evidence taken to enable them to fairly and equitably fix the actual cash value of the properties of such persons."

The railway filed its return with the Commission, and after considering the same, together with other evidence, the Board fixed the cash value of the railway's property in Tennessee, for taxation, at $16,223,199, for the biennium 1938-39. The railway filed numerous exceptions to the assessment, which were denied after a full hearing, and the railway prayed and was granted an appeal to the State Board of Equalization. The statute (Code, sec. 1533) provides that the Commission shall file with the Board the assessments made by them, together with such records as may be deemed necessary. Section 1534 provides that the Board shall proceed to examine the assessments so made, and are authorized to increase or diminish the valuation placed upon any property valued by the Commission, and are further authorized to request of the Commission additional evidence touching the property assessed; that if the Board so desire, they have the power, without referring any assessment to the Commission, themselves to employ experts, accountants,

and to call witnesses to testify upon any assessment certified to them by the Commission, and to call upon the Interstate Commerce Commission for any valuation of property in the office of such Commission; that the assessments shall not be deemed complete until corrected and approved by the Board. Under Code, Section 1535, the Board is required to certify to the Commission the valuation fixed by them upon each property assessed, and the action of the Board ''in fixing the valuation upon such property shall be conclusive and final and the valuation so fixed shall be assessed against said property and the taxes due thereunder be paid.''

The Board reviewed the assessment of the railway's property and approved the same. Before the Board certified back to the Commission the amount of the assessment, as approved, the railway filed its petition for writs of *certiorari* and *supersedeas* in the Circuit Court of Davidson County. The circuit judge, upon motion of the Board, taking into consideration the entire record as certified to the circuit court by the Board, dismissed the petition and discharged the *supersedeas*. From this action of the circuit judge, the railway has appealed to this court and made numerous assignments of error. The railway in the presentation of its case has not followed *seriatim* the assignments of error. As a matter of convenience we will follow the same course.

The railway complains, in the argument contained in its brief, that ''The assessment is not supported by any evidence; is grossly in excess of the value of the property as established by the evidence; was made by methods not calculated to produce a fair and just result and therefore arbitrary and illegal; and was made in violation of the provisions of the statutes controlling the assessment of railroad property.''

■ The assessment made by the Board is made final and conclusive by statute (Code, sec. 1535) and is not open to review by the courts on *certiorari*, where the Board has not, with reference to the assessment, exceeded its jurisdiction or acted illegally or fraudulently. *Tomlinson* v. *Board of Equalization*, 88 Tenn., 1, 12 S. W., 414, 6 L. R. A., 207; *Anderson* v. *Memphis*, 167 Tenn., 648, 72 S. W. (2d), 1059; *Treadwell Realty Co.* v. *City of Memphis*, 173 Tenn., 168, 116 S. W. (2d), 997. In *Savage Co.* v. *City of Knoxville*, 167 Tenn., 642, 72 S. W. (2d), 1057, it was held that value placed on property for taxation by duly constituted taxing authorities is not reviewable by the court, nothing else appearing, since value is a matter of opinion. In *Mossy Creek Bank* v. *Jefferson County*, 153 Tenn., 332, 284 S. W., 64, it was held that mere error in honest judgment of a county board of equalization as to value of property will not obviate binding effort of conclusion, in absense of fraud. The rule announced by the above cases is no longer open to doubt or discussion. Where, however, the Board acts illegally, fraudulently or in excess of its jurisdiction, *certiorari* is the proper remedy. *State ex rel.* v. *Dixie Portland Cement Co.*, 151 Tenn., 53, 58, 267 S. W., 595; *Louisville & N. Railroad Co.* v. *Bate*, 80 Tenn. (12 Lea), 573.

■ The provision of the statute that the valuation made by the Board "shall be conclusive and final" presupposes a substantial compliance with the proceedings prescribed with reference to the method of making valuation of railroad property.

■ The Commission, as affirmatively appears from the itemized assessment made by them, considered all of the elements specified in the statutes (Code, sec. 1526). The Commission had before it the return of the railway and other evidence submitted and fixed the value of the

railway's property in the sum above stated. No witness, or document in evidence, fixed the exact value as reported by the Commission; but from the facts developed, the Commission held itself able to fairly and equitably fix the actual cash value of the property. No intentional discrimination or fraud on the part of the Commission or Board is charged or proven. In *Rowley* v. *Chicago & N. W. R. Co.*, 293 U. S., 102, 55 S. Ct., 55, 59, 79 L. Ed., 222, the court said: "There is nothing in this record to suggest any lack of good faith on the part of the board. Overvaluation resulting from error of judgment will not support a claim of discrimination. There must be something that amounts to an intention, or the equivalent of fraudulent purpose, to disregard the fundamental principle of uniformity."

In *Chicago Great Western R. Co.* v. *Kendall*, 266 U. S., 94, 45 S. Ct., 55, 57, 69 L. Ed., 183, 189, the court said: "It is not enough, in these cases, that the taxing officials have merely made a mistake. It is not enough that the court, if its judgment were properly invoked, would reach a different conclusion as to the taxes imposed. There must be clear and affirmative showing that the difference is an intentional discrimination, and one adopted as a practice."

The rule announced in the above cases is generally recognized and needs no additional citation of authority in its support.

■ The good faith of the Commission and Board and the validity of their action are presumed; when assailed, the burden of proof is upon the complaining party. *Sunday Lake Iron Co.* v. *Wakefield Township*, 247 U. S., 350, 38 S. Ct., 495, 62 L. Ed., 1154.

It is contended for the railway that the Commission and Board should have made the assessment on the basis

of capitalization of net income at a rate which would measure a fair return to the investor in the property, or, at least, that such method should have been made the predominant factor in arriving at the value of the property. Capitalization of net income is not specified in Section 1526 of the Code; but this factor could have been considered along with other elements in fixing the value of the property. Incorporated in the assessment made by the Commission under the caption "Earnings" is a tabulated statement of net operating income for the years 1933-1938. A statement filed by the railway showed net operating revenue for the years 1931-1937 averaged $947,530.60 per annum, and that the net revenue from nonoperating property for the seven-year period averaged $13,747.28, making a total average net operating revenue of $961,277.88. The insistence is that if this average net revenue be capitalized at 6%, a value of $16,021,298 is shown for the entire system as compared with the $23,996,604.14 fixed in the assessment. The statement of average income was considered by the Commission, as is shown by the following statement of one of the Commissioners made on the argument before them, ". . . to see what the trend was, whether the trend was upward or downward with the company, as justification for reducing or raising the assessment, so that was largely the purpose of having that in the brief, was what I thought." Greater weight was given to the most recent figures "to judge present day conditions."

We are unable to agree that the Commission, or the Board, was under any legal compulsion to make the assessment on the basis of capitalization of net income, or to make net income a predominant factor in arriving at the value of the property. A railroad is to be assessed according to its value as a railway by taking into con-

sideration the elements specified in Code, section 1526, which includes "other evidence taken to enable them to fairly and equitably fix the actual cash value of the properties." Counsel for the railway refers to *Louisville & N. Railroad Co.* v. *State,* 55 Tenn. (8 Heisk.), 663, 798, as approving decisions holding that "a tax can only be just and equal on railroad corporations, by being assessed upon the profits." The court did not approve this as an exclusive method of ascertaining value; on the contrary, the court said, "We can conceive of no better criterion by which its value can be ascertained, than, first, the value of its structure, superstructure and properties, and then the profits which may enure to its owners in its operation." The court further stated, "A tax on a corporation may be proportioned to the income—revenue, as well as to the value of franchise granted, or the property assessed," citing *Minot, Jr.,* v. *Railroad Co.,* 18 Wall., 206, 21 L. Ed., 888. *Louisville & N. Railroad Co.* v. *State, supra,* was decided prior to the enactment of the first railroad assessment law in 1875.

In *Great Northern Ry. Co.* v. *Okanogan County, D. C.,* 223 F., 198, 201, it is said: "The value of a completed railroad is not easy of ascertainment. Railroads are not usually bought and sold on the open market. Their value is in use, rather than in exchange, and many elements go to make up that value. The cost of construction or reproducing, the income, the earning capacity, the value of stock and bonds, have all been taken into consideration by the courts. None of these elements are controlling, however."

A like statement to the above is to be found in 26 R. C. L., 189.

It is complained by the railway that the apportionment of distributable property to Tennessee on

mileage basis is invalid. The Commission found the railway's distributable property in Tennessee to be the average value per mile of the system distributable property multiplied by the number of miles of main track in Tennessee. On the basis of a total mileage in the system of 1,115.34, of which 800.02 miles is in Tennessee, and the total entire value of distributable property to be $18,022,-133.14, the Commission assigned to Tennessee for taxation a value of $12,926,944. It is contended by the railway that this method of allocation is contrary to statute (Code, section 1526), and has the effect of imparting into Tennessee for taxation values located in other states, contrary to Article 1, section 8, and Article 2, section 28, of the Constitution of Tennessee, and the due process clause of the Fourteenth Amendment to the Constitution of the United States. It is further contended that the value of the entire property ($23,996,604.14) ''is in substantial excess of any reasonable opinion or estimate of value supported by or deducible from any evidence upon which such assessment was made, and which finding of value is not supported by or based upon any evidence in the record upon which the assessment was made, all of the evidence showing that the actual value is not in excess of $16,021,-298.'' This is a renewal of the contention that the value of the property should have been fixed on the basis of capitalization of net revenue of the system, and not upon the basis adopted by the Commission.

In *Louisville & N. Railroad Co.* v. *State, supra,* 55 Tenn., at page 797, the court said, ''If it be an interstate railroad, as in this case—a part in this State and a part in another—we know of no better plan to fix the taxable value of that portion lying in this State, than to ascertain what proportion the latter bears to the whole. Upon this

subject, however, there is great conflict of authority, and great contrariety of judicial reasoning and ruling."

In *Franklin County* v. *Railroad*, 80 Tenn. (12 Lea), 521, 540, the court said: "No part of the mere roadway can be said to be more valuable than any other part, when considered as a track for the exercise of the franchises of the company as a common carrier. It is, like the franchise itself, a unit for the purposes intended, these purposes being not merely the use of the road for the profit of the company, but its use for the benefit of the public. Any interruption of that use is a public as well as a private calamity. 'It may well be doubted,' says the Supreme Court of the United States, 'whether any better mode of determining the value of that portion of the track within any one county has been devised than to ascertain the value of the whole road, and apportion the value within the county by its relative length to the whole': *State Railroad Tax Cases*, 92 U. S., [575], 608 [23 L. Ed., 663]."

In *Pittsburg, C. C. & St. L. R. Co.* v. *Backus*, 154 U. S., 421, 14 S. Ct., 1114, 38 L. Ed., 1031, the court quoted with approval the above paragraph taken from *Franklin County* v. *Railroad* and held, that the value of one part of a single continuous line of railroad is fairly estimated by taking the part of the value of the entire road which is measured by the proportion of the length of the particular part to that of the whole road, unless accompanied with proof that portions of the road outside of the State were of largely greater value than any similar length of road within the State. In *Cleveland, C. C. & St. L. R. Co.* v. *Backus*, 154 U. S., 439, 14 S. Ct., 1122, 38 L. Ed., 1041, it was held that in assessing a part of a railroad within a State, the other part of which is in an adjoining State, when the assessing board ascertains the value of the

whole line as a single property, and then determines the value of that within the State, upon the mileage basis, that is not a valuation of property outside the State, if no special circumstances exist to distinguish the conditions in the two States, such as terminal facilities of enormous value in one and not in another.

The record in the instant case does not disclose that the portions of the railroad outside Tennessee are largely of greater value than the portion within the State, or that any special circumstances exist to show a greater value outside the State than within the State. The railway contends, however, that by breaking down the whole net revenue so as to show the portion thereof earned within the State as compared to that earned out of the State a greater value is shown to exist out of the State. The railroad was valued as a whole by the Commission. All of the elements set forth in Code, section 1526, were considered. Under the well-established rule for assessment on a mileage basis, no exceptional facts appearing, the portion of the railroad in Tennessee could not be treated as an independent line, disconnected from the part without the State. Furthermore, the exception to the rule contemplates, we think, that it be clearly shown that the portion of the road out of the State has a greater value than the part within the State, such as terminal facilities or other improvements not found within the State.

Our conclusion on the question of allocation is that the assessment did not violate any of the railway's rights under the State Constitution, nor under the Fourteenth Amendment to the Federal Constitution.

Another complaint made by the railway is that the Commission and Board assessed its property at actual value, while the property of all other taxpayers was assessed at two-thirds of its actual value. A large number

of affidavits made by local assessors were filed with the Commission to the general effect that affiants intentionally and systematically assessed other property for taxation at an amount not exceeding 75% of its value. Affidavits from others to like effect were also filed.

County assessors are required by law to assess property at its actual cash value (Code, section 1349). And they take an oath of office that they will assess all property at its actual cash value (Code, section 1343). They must make oath to the assessment lists, which contains the statement that they have assessed all property at its actual cash value (Code, section 1375). The assessment lists are returned to the county court clerk.

The assessments as made by the county assessors are not final. On the contrary, the assessment lists are required to be delivered by the county court clerk to the county board of equalizers (Code, section 1424). Under Code, section 1426, the duties and powers of the board are defined. It is made their duty "to carefully examine, compare, and equalize the county assessments." It is further provided therein that, "Said board shall have the power, and it is hereby made its duty, to increase or lower the entire assessment roll or any assessment contained therein, so as to equalize the assessment of all property contained therein, *and make such assessment conform to the actual cash value of the property described in the assessment*. If the property described in said assessment lists or any part thereof *shall have been assessed at less than the actual cash value thereof, the value of the same shall be increased so as to conform to the actual cash value thereof* . . ." (Italics ours.)

Under Code, section 1434, the county board upon returning the assessment roll to the clerk are required to append to the same a verification, signed by each member,

that they have equalized and fixed the value of all property at the actual cash value thereof.

Under Code, section 1440, it is made unlawful for board to equalize at less than actual cash value. It is made the duty of the county board of equalizers to transmit to the State Board of Equalization a summary of the assessment as completed by it.

The State Board of Equalization is directed to meet at places throughout the State, selected by them. (Code, section 1448.) And it is provided in section 1456, that the Board *"shall have jurisdiction of, and it shall be its duty, to equalize during its session the assessments of all properties in the state"* and its action *"shall be final and conclusive as to all matters passed upon . . . subject to judicial review."* (Italics ours.)

If the county assessors and the few members of county boards of equalizers making affidavits on the hearing before the Commission assessed property at less than actual value, and did so intentionally and systematically, there is no showing whatever that the members of the State Board of Equalization violated their oath of office by underassessing property. In the absence of a contrary showing, it must be assumed that the State Board did their duty. There is neither allegation nor proof that the State Board intentionally and systematically refused to equalize assessments at actual value. The good faith of such officers and the validity of their actions are presumed. *Sunday Lake Iron Co.* v. *Wakefield Township,* 247 U. S., 350, 38 S. Ct., 495, 62 L. Ed., 1154. In order to support a claim of discrimination under the equal protection clause of the Fourteenth Amendment there must be something that amounts to an intention or the equivalent of fraudulent purpose to disregard the fundamental principle of uniformity.

Another complaint made by the railway is that the Commission and Board included in the assessment interest bearing securities and corporate stocks to the value of $2,484,000, not subject to taxation. The assessment shows on its face that the value of the railroad was fixed, "making due allowance for all non-taxable securities held." The securities were considered by the Commission merely as reflecting on the present financial condition of the railway.

It is complained that the Commission included 3.65 miles of railroad, known as the "West Nashville Branch," as main track mileage in computing the value of the railway's distributable property. It is asserted that all of the evidence shows this line to be side tracks. The railway's own return shows this 3.65 miles to be main track.

From our examination of the record we are satisfied that the assessment made on the property of the railway was fair and equitable. There is nothing to support the contention that the assessment was discriminatory or arbitrary.

The record shows (Ex. 19) that the property of the railway, in Tennessee, was valued for taxation in former and 1938-1939 years as follows:

```
"1923-1924 ...................... $24,000,000
 1925-1926 ...................... 24,795,303
 1927-1928 ...................... 24,795,303
 1929-1930 ...................... 26,000,000
 1931- ...................... 23,750,000
 1932-1933 ...................... 17,000,000
 1934-1935 ...................... 16,999,966
 1936-1937 ...................... 16,499,998
 1938-1939 ...................... 16,223,194"
```

The former valuations were not made the basis for the 1938-1939 assessment; but they may be looked to on the

argument that the railway's property had declined in value.

The Board in its opinion stated, "It will be seen, that the assessment made for the year 1938-1939, is a substantial reduction from the high of 1929-1930, indeed, a reduction in the sum of $9,776,806.00. We are convinced that this reduction of companies assessment from the high point in recent years, is comparable with the reduction enjoyed by owners of other property or any class of property, within the bounds of this State."

It is argued that property generally, throughout the State, is assessed for taxation at less than cash value, and that the court should take judicial knowledge of such underassessment. Whatever may have been the practice in this regard in former times, it is our belief that since 1930 assessments generally are and have been higher than the actual cash value of the property assessed.

 It is argued that the Commission "arbitrarily assessed the railway's distributable property at the valuation placed upon it for the preceding biennium, notwithstanding the abandonment of 38 miles of Tennessee main track which the Commission had in said previous assessment included at a valuation of $15,407.93 per mile, aggregating $587,500." The argument seems to be that the Commission and Board should have deducted from the assessment the sum of $587,500 representing the value alleged to have been placed on 38 miles of main track in the assessment of 1936-1937, and asserted to have been thereafter abandoned. The railway returned 800.2 miles of main track for the 1938-1939 assessment and that is the mileage assessed. The 38 miles was not included in the return or the assessment. In considering the various factors and elements going to make up the distributable value of the properties for 1938-1939, the Commission and

Board found the total value thereof (excluding the 38 miles above mentioned) to be $12,926,944, which assessment it is asserted is the same as 1938-1939. The total assessment for 1938-1939 was $276,804 less than for the previous biennium. The valuation for assessment of the 800.2 miles of main track returned by the railway for assessment fixed by the Board, under the statute and authorities hereinbefore cited, cannot be reviewed by this court, the Board not having exceeded its jurisdiction or acted illegally.

The opinion of the Board contains the following: "This appeal presents to the Board a difficult problem. Each member is ex officio. Therefore, adequate time is not ours to give the necessary investigation to entirely satisfy even ourselves, that we may reach an equitable conclusion. However the responsibility is ours and we would not shirk it."

It is contended that this statement shows that the Board made the assessment, or approved the assessment without making necessary investigation. The opinion specifically refers to the railway's exceptions and there is nothing to show that they were not given consideration. While not dealt with *seriatim* in the opinion, the conclusion reached was that the assessment made should stand. Various additional affidavits, charts and maps were introduced by the railway before the Board and there is nothing to show that these were not considered by the Board. On the contrary the record shows that the exceptions were fully argued before the Board and the able counsel for the railway and the Board acquainted the Board with all the pertinent facts and with their respective contentions. The assessment as made by the Commission, together with the whole record as made up before it, was filed with the Board, as required by Code,

section 1533. The Board "proceeded to examine the assessment so made," as required by Code, section 1534. It received additional evidence from the railway. It is mere empty assertion to say that the Board did not give proper or sufficient consideration to the cause. To upset the decision of this *quasi* court because of the expression set out above, which was immediately followed by the language, "However, the responsibility is ours and we would not shirk it," when there has been a full hearing on the exceptions, would be wholly unwarranted, especially when on a full hearing by the Board it was found that the exceptions were without merit, and subsequently so found, in effect, by the circuit judge.

After due consideration, we find all of the assignments of error to be without merit. The result is that the judgment of the trial court is affirmed. The railway will pay the costs of the appeal.

Cook, J., and W. T. Kennerly, S. J., concur.

McKinney and Chambliss, JJ., dissent.

Mr. Justice McKinney (dissenting).

I am of the opinion that the State Board of Equalization has not complied with the law, and for that reason the case should be remanded to that body in order that it may find the assessable value of the Railway property.

The State Board of Equalization, as I see the matter, has proceeded upon the theory that it is an appellate board to review and correct the errors committed by the Railroad and Public Utilities Commission when, according to my interpretation of the law, it is the final tribunal for fixing the value of the Railway property, and the report of the Commission is only advisory and informative. The Commission assesses the property and

then certifies same to the State Board of Equalization for its final determination as to its cash value.

Under the law it is made the duty of the Railway to file a sworn schedule on the first day of April biennially, in the even years, giving the Commission the information set forth in section 1509 of the Code. Other pertinent statutes are as follows:

1526. ''Upon examination of every such schedule and statement and all other evidence taken by them, the said commission shall proceed to ascertain and determine the value of said property within the state for taxation and assess the same accordingly, taking into consideration the capital stock, corporate property, franchises, and gross receipts, the market value of the shares of stock and bonded indebtedness, and such other evidence as is afforded by said statements and schedules or other evidence taken to enable them to fairly and equitably fix the actual cash value of the properties of such persons.''

1533. ''Said assessments shall be completed on or before the first Monday in August, and within ten days from the first Monday in August, the owner of any property assessed may appear and file exceptions to said assessment, together with such evidence as they may desire to submit as to the value of the property assessed, and at the expiration of said ten days, said commission shall reassemble and examine such additional evidence and exceptions as may have been filed, and act thereon, either changing or affirming their valuation. And on or before the first Monday in September, said commission shall file with the board of equalization the assessments made by them, together with such records as may be deemed necessary.''

1534. ''The state board of equalization shall proceed to examine said assessments so made by the commission,

and they are authorized to increase or diminish the valuation placed upon any property valued by said commission, and are further authorized to require of said commission any additional evidence touching one or more of the properties assessed, and shall consider such additional evidence so furnished in fixing the correct value of any property so assessed, and said assessments shall not be deemed complete until corrected and approved by the said board of equalization; and the governor is authorized to call said commission at any time to perform the duties imposed upon them; provided, however, that if said board of equalization shall so desire, they shall have the power without referring any assessment to said commission, themselves to employ experts, accountants, and to call witness to testify upon any assessment certified to them by said railroad commission; and said board of equalization shall have the same powers to compel attendance of witnesses, production of books, papers, and documentary evidence as is by this statute given to said commission. Said board of equalization shall have the right to call upon the interstate commerce commission for any valuations of property in the office of the interstate commerce commission and evidence in possession of said commission in support of such valuations.

"All of the evidence thus acquired by said board of equalization shall be considered by them in addition to the evidence transmitted to said board by said commission in support of the assessment so fixed by said commission.

"Any expense incurred by said board in calling for the additional proof as to the value of any property certified to them by said commission shall be by said board of equalization certified to the state comptroller and paid by

him out of any moneys in the treasury not otherwise appropriated.''

1535. ''On or before the third Monday in October, said board of equalization shall certify to the commission the valuation fixed by it upon each property assessed under this law, and the action of the board of equalization in fixing the valuation upon such property shall be conclusive and final and the valuation so fixed shall be assessed against said property and the taxes due thereunder be paid.''

From the foregoing statutes it appears that the responsibility for finally fixing the value of the Railway property is vested in the State Board of Equalization, and it cannot discharge that duty by giving the report of the Commission a perfunctory and superficial examination and consideration.

The report of the State Board of Equalization begins with this statement:

''This appeal presents to the Board a difficult problem. Each member is ex officio. Therefore, adequate time is not ours to give the necessary investigation to entirely satisfy even ourselves, that we may reach an equitable conclusion.''

As I construe the statutes, the assessment by the Commission does not become final until approved by the State Board of Equalization; that Board being vested with power to either increase or decrease the value placed upon the Railway property by the Commission even though there has been no appeal. The Board states very frankly that it did not have time to make the necessary investigation to enable it to reach an equitable conclusion. But the statute imposes such duty upon it, and until such investigation and consideration is made it has not complied with the law. In this connection I wish to

emphasize the fact that the statute authorizes the Board "to employ experts, accountants, and to call witness to testify upon any assessment certified to them by said railroad commission." They also have the right to call upon the Interstate Commerce Commission for any valuation made by it of the involved property. The State Board of Equalization is, therefore, vested with all necessary authority, and has the facilities at its disposal to enable it to arrive at an equitable and just valuation of the Railway property.

The State Board of Equalization, furthermore, seems to have been largely influenced by the 1936-1937 assessment of the Railway property, which, it states, the record shows was agreed to by the Railway. Such statement is not supported by the record; but if it was that would be no criterion of value since the statute expressly provides the method by which such value is to be ascertained.

The Board in its report makes the following additional statement:

"It appears in the record, and it was stated in argument, that the Commission, in reaching its conclusion, looked to the capital stock, corporate property franchises and gross receipts, the market value of the shares of stock and bonded indebtedness, and all evidence as afforded by the returns, statements and schedules made by the company. We assume that their statements are true, and we understand that these elements must be used, as a matter of law, in making such assessments."

It is apparent from this statement that the Board did not consider these elements, as it was its duty to do, but proceeded upon the assumption that the Commission had considered same and had, therefore, arrived at a valuation in the manner provided in the statute.

Counsel for the State contend that there is no fixed, positive or definite formulation for the valuation of such property. We are unable to accede to this position of counsel. The Board, necessarily, is to arrive at the valuation by the method set forth in the statute for the ascertainment of its value by the Commission. It was certainly never intended that the Commission should use one formula and the Board a different one.

This is a case of great importance both to the State and the Railway, and one that the Board should fully and carefully investigate and consider. Only three of the five members composing the Board participated in the hearing and consideration of this case. While the statute provides that three members of the Board shall constitute a quorum, I am of the opinion that as a matter of policy it would be better in a case of this magnitude and importance if it were heard, investigated and considered by the entire membership of the Board in order that as full and complete justice may be arrived at as is humanly possible.

MR. JUSTICE CHAMBLISS (dissenting).

I find myself in accord with the views expressed by Mr. Justice McKINNEY in his dissenting opinion. Whether because of "inadequate time . . . to give the necessary investigation," as expressed in the opinion handed down by the Board of Equalization, or because of an under estimate by the members of that Board of the extent and nature of the duties which I understand the law imposes upon them in the making of railroad assessments, as distinguished from assessments of real estate generally, I am satisfied that errors appear.

I fully appreciate that the Circuit Court and this court are restricted to the correction of errors involving ex-.

cess of jurisdiction, illegality or fraud, without power to substitute our opinion as to value for that of the assessing tribunal, but no such restriction applies to the Board of Equalization. The Board sits as a *quasi*-court with *de novo* jurisdiction, with the obligation to render judgments of appraisal of value for taxation upon an independent investigation and examination into all the evidence. It is this judgment, so arrived at and exercised independently, which is made "conclusive and final."

It seems to me quite obvious from the recitals of the brief opinion filed, that the judgment fixing the assessment in this case was not so arrived at, but was rested largely upon two matters referred to in the opinion, (1) statements, or conclusions, in the report of the Railroad Commission, which, says the opinion, "we assume . . . are true" (that is, have adopted without independent examination and verification); and (2) the record of assessments of this Railroad for previous years, set out in the opinion.

I realize the difficulty of the task which I understand the law imposes on the Board of Equalization, composed, as it is, of gentlemen whose duties incident to their several highly important offices are so exacting as to leave them little time for the discharge of their extra *"ex officio"* duties as members of this Board. To meet this situation, however, the legislature has expressly provided that the Board may employ their own experts and accountants and bring in evidence from various sources of different kinds, including such as may be in possession of the Interstate Commerce Commission, all in order that the Board of Equalization may fit itself to make its own finding and appraisal of values on which to base its assessments. Now it does not appear that any such course was followed, but, as already suggested, the Board

assumed the correctness of the conclusions reported by the Railroad Commission and adopted them *in toto*. However competent and capable the distinguished gentlemen composing the Railroad Commission are, the duty and responsibility is imposed, not upon them, but upon the Board of Equalization, of rendering a judgment, which shall be "final and conclusive," after making for itself the investigation necessary to enable it to fix for itself these values.

It was exceedingly important to the petitioner in this case that the broad *de novo* jurisdictional powers of the Board of Equalization should be fully and carefully exercised,—that "adequate time" should be taken for "the necessary investigation" that the Board might "reach an equitable conclusion."

In addition to, and in line with the general criticism which I have felt constrained to make of the inadequacy of the examination apparently made by the Board of Equalization, in the exercise of its independent and final jurisdiction, an examination of the pertinent records convinces me that several specific errors appear going to the legality of the judgment of the Board of Equalization before us for review:

1. Reference has been made to the consideration given assessments of this Railway's properties for former years. One-third of the brief opinion of the Board is devoted to a comparative analysis of these former assessments which are quite apparently given predominant consideration. I find no authority for thus using assessments made in former years as a basis of value. The petition shows, and common knowledge of affairs supports, that radical and fundamental changes have taken place in the last few years in the conditions which basically affect the value of railroads, so that assessments

of former years furnish today no fair controlling *criteria* for appraisal of this particular, and peculiar class of property. For example, what is known as the "franchise" of a railroad, formerly a highly important element of value, has today greatly less value. A franchise is a special privilege, originally granted to a subject by the Crown, now in this country by the Government. It implies profitable advantages, not enjoyed generally, or competitively. A common incident of a franchise is a degree of monopoly. The grant to railroads carries the right of eminent domain, for instance. Inherent, therefore, in the franchise of a railroad, were former advantages which yielded automatically more or less large profits, not to be generally enjoyed. Now, this is changed, and it must be conceded—all men know it—that practically all of this element of value, formerly the dominant incident of the franchise, has been wiped out, in large measure by the policies and contributions to competition of the Government itself. This competition in transportation of passengers and freight, graphically set forth in the proof in the record, has apparently not only wiped out the major elements of value of the franchise, but has diminished greatly the "use" value of the railroads as a whole, and calls for at present a thorough going investigation of basic elements of value applicable to present day conditions, which it is apparent the Board of Equalization, for reasons indicated, did not undertake, or have opportunity, to make.

2. It is complained for petitioner that the Board of Equalization refused to regard the net earnings as an important element in fixing value. Attention is called to the argument before the Board of Equalization of Mr. Hendley (expert and spokesman for the Railroad Commission) that "not once in the law do we find the word

'net;' '' that ''the elements principally are the 'gross' receipts, the value of the stocks and bonds and the value of the corporate property;'' and in commenting on the assessment made by the Railroad Commission, the opinion of the Board of Equalization says that it was the ''gross receipts'' which were considered. While it is true that in Code, Section 1526, the expression ''gross receipts'' is used, we think it clear that the law as a whole contemplates that the operating expenses shall be considered in the same connection, thus arriving at the ''net.'' The language of this section as a whole so requires, calling, as it does, for statements and schedules and other evidence as a basis for fixing the values. Also, Section 1509, setting out more specifically the information to be laid before and considered in making the assessment, expressly couples together the gross receipts and the expenses.

3. I think the record as a whole indicates that, contrary to the law applicable, certain intangibles of considerable amount, non-taxable under what is known as the Hall income tax law, have been taken into account in fixing the valuation arrived at as a whole. If this is so, then the assessment has to this extent, certainly, been illegally arrived at. The brief opinion is silent on this question, much stressed by petitioner, but it does appear that Mr. Hendley, the official spokesman for the Railroad Commission, in presenting the case to the Board of Equalization, did specifically call attention to the fact that the Railway held these valuable assets and this item was thus plainly brought to the attention of the Board in support of the assessment figures as reported by the Railroad Commission. It seems to me that it may be fairly assumed that these items were taken into account in fixing the assessment. In arguing before the Board

of Equalization for its adoption of the assessment figures reported by the Railroad Commission, Mr. Hendley, above mentioned, said, "The N. C. & St. L. Railway unlike other railroads have a nice cash surplus on hand. Its financial set up is good. On January 1 of this year they had on hand cash and non-taxable Federal bonds and notes in the amount of $3,569,801.00 to which should be added the $140,000.00 earned since January, 1938." The inference seems plain that these elements showing the Railway's "financial set up is good" were considered in appraising the corporations properties as a whole—otherwise why mention them? Commenting on this matter, the majority opinion says, "The securities were considered by the Commission merely as reflecting on the present financial condition of the Railway." Obviously, such consideration reflected an increased value and thus served to bolster up the assessment as a whole.

4. Reference has been made to apparent reliance on assessments of former years. It is shown that 38.96 miles of main track of petitioner's railroad, formerly assessed at $590,292.95, had been abandoned, with the approval of the Interstate Commerce Commission. This reduced the total track mileage in Tennessee from 838.98 to 800.02 miles, yet the value fixed for assessment here is identical with that made in the greater mileage for 1936, being, in both instances, $12,926,944. This seems to demonstrate that the assessment for this previous year was not only considered, but adopted.

5. The evidence appears to show that 3.65 miles of track, described as West Nashville Branch, is an industrial or side track and that this trackage has been included in the assessment as returned as main track mileage.

Without further elaboration, I concur with Mr. Justice McKinney that justice demands that the case should be remanded to the Board of Equalization for a re-determination of the assessment.

ON PETITION TO REHEAR.

Mr. Justice DeHaven delivered the opinion of the Court on Petition to Rehear.

This cause is again before the court on the railway's petition to rehear and the reply of the State Board of Equalization thereto. The court discussed in its opinion the questions made by the railway's assignments of error and decided the same. Most of the petition to rehear is devoted to a reargument of some of these questions. One new question is sought to be raised by the petition. It is asserted that the localized property of the railway was assessed at $3,297,250 by the Board "without knowing or inquiring how the aggregate is made up," and that the Commission withheld from the Board "all information of its valuation of localized property items." This attack on the assessment was not specifically made by any of the assignments of error filed in this court. Rule 14 of this court provides, among other things, as follows (173 Tenn., 874):

"Assignment of Error. The assignment of errors shall contain in the order herein stated:

"(1) . . .

"(2) A statement of the errors of fact or law relied upon to reverse or modify the same, showing *specifically* wherein the action complained of is erroneous, and how it prejudiced the rights of the appellant, or plaintiff in error, and reference to the pages of the record where the ruling of the court on matters constituting errors of law appears; and in case it is an error of fact, to the pages

of the record where the testimony is to be found relied upon to sustain the same.'' (Italics ours.)

 The railway, as before stated, did not specifically assign as error the action of the Commission and Board in assessing its localized property at $3,297,250. The rule assumes *prima facie* the correctness of the proceedings of the inferior courts, and imposes on parties assailing them the duty of specifically pointing out the errors of which they complain. *Denton* v. *Woods,* 86 Tenn., 37, 5 S. W., 489; *Woods* v. *Frazier,* 86 Tenn., 500, 8 S. W., 148. A subject on which no assignment of error has been made need not be considered on appeal. *Hawkins* v. *Hubbell & Houser,* 127 Tenn., 312, 154 S. W., 1146.

The exceptions filed before the Commission did not specifically complain of the assessment on the localized property. The petition for *certiorari* alleged that it prayed an appeal to the Board ''to the end that said exceptions might be there further considered,'' and it was further averred that it was notified ''that its exceptions as filed with the Railroad and Public Utilities Commission would be considered by the (fol. 276) State Board of Equalization on November 2, 1938, and said hearing was accordingly held upon the evidence and record transmitted to the Board by the Railroad and Public Utilities Commission.'' The railway in its petition for *certiorari* to the crcuit court exhibited therewith its exceptons. It was not alleged in the petition for *certiorari* that the assessment made on the localized property was illegal or void. No such issue was specifically tendered by the petition.

This court did not hold that the examination by the Board of the assessment made by the Commission was dependent upon the railway's appeal or limited or restricted thereby. On page 2 of the opinion the substance of Code, section 1534, defining the duties of the Board

with reference to the assessment returned by the Commission is set out. But, as shown by the record, the railway in its petition for *certiorari* to the circuit court did not specifically allege that the assessment of its localized property made by the Commission and approved by the Board was invalid for any reason.

The railway's motion for a new trial, filed in the Circuit Court, does not contain in any of the grounds therefor any specific complaint that the trial judge held the assessment of localized property valid, or that he refused to pass upon such question.

Rule 14 (5) of this court provides that the grounds upon which a new trial is sought in this court "will not constitute a ground for reversal, and a new trial, unless it affirmatively appear that the same was specifically stated in the motion made for a new trial in the lower court, and decided adversely to the plaintiff in error, but will be treated as waived, in all cases in which motions for a new trial are permitted." The following is recited in the rule:

"This is a court of appeals and errors, and its jurisdiction can only be exercised upon questions and issues tried and adjudged by inferior courts, the burden being upon the appellant, or plaintiff in error, to show the adjudication, and the error therein, of which he complains. *Railroad Co.* v. *Johnson*, 114 Tenn., [632], 640 [88 S. W., 169]; *Wood* v. *Frazier*, 86 Tenn., [500], 501 [8 S. W., 148]; *Jacks* v. *Williams-Robinson Lumber Co.*, 125 Tenn., 123 [140 S. W., 1066]; *Hobbs* v. *State*, 121 Tenn., 413 [118 S. W., 262, 17 Ann. Cas., 177]; *Tennessee Central R. Co.* v. *Brown*, 125 Tenn., 351 [143 S. W., 1129]."

For the reasons stated above, the railway cannot be heard to complain in this court of the amount of the assessment made on its localized property.

The petition to rehear contains some erroneous inferences and deductions from matters decided by the opinion of the court. We are responsible alone for the opinion and not for the construction, inferences or deductions that counsel may place thereon.

The Board has jurisdiction. It did not act illegally. The railway makes no claim of fraud as against the Commission or the Board. The valuation placed on the properties of the railway for taxation by the Board cannot be reviewed by the courts, in the absence of fraud. See authorities cited in opinion.

Our conclusion is that the petition to rehear is without merit and must be overruled.