McCord *et al. v.* Southern Ry. Co.

(*Nashville,* December Term, 1947.)

Opinion filed May 3, 1948.

Roy H. Beeler, Attorney General, William F. Barry, Solicitor General, and E. J. Walsh, of Nashville, and Hamilton E. Little, of Memphis, for plaintiffs in error.

L. M. ABBOT, of Washington, D. C., CHAS. H. SMITH, of Knoxville, and FERRISS C. BAILEY, of Nashville, for defendant in error.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

This is an appeal by the State Board of Equalization, hereafter designated as the Board, from the judgment of the Circuit Court of Davidson County adjudging void the assessment of the properties in Tennessee of appellee, Southern Railway Company, for *ad valorem* taxes for the biennium 1945-1946.

That Court likewise adjudged invalid the assessment by this Board of the properties in Tennessee of the N. C. & St. L. Railway Company. That judgment has this day been reversed and the assessment held valid in an opinion written for this Court by MR. JUSTICE GAILOR in the case of *McCord et al. v. Nashville C. & St. L. Ry. Co.*, 187 Tenn. 277, 213 S. W. 2d 196. With the exception of the difference in the amount of the assessment, the record in that case and the issues determined are, as to several questions, the same as in this case. The opinion in that case makes an extensive review of the law which controls the determination of those questions made by the record. Hence, extensive restatement here of that law is not necessary.

Pursuant to the requirements of Code Section 1509, as amended by Chapter 18 of the Public Acts of 1945, the Southern Railway Company, hereinafter referred to as the Railroad, in 1945 filed with the Railroad and Public Utilities Commission, hereinafter called the Commission, required schedules, statements and other information

for its use, as intended, in making the assessment of the properties. Upon consideration of this and other evidence in the record the Commission fixed the assessment. The exceptions of the Railroad were heard and overruled, and it appealed to the Board. The Commission filed its assessment, together with the record made before it, with the Board as required by Code Section 1533, as amended by Chapter 19 of the Public Acts of 1945.

Pursuant to the requirements of Code Section 1534 and the authority thereby granted, a hearing *de novo* was had by the Board on the appeal of the Railroad upon the record filed with it by the Commission and upon such further testimony and arguments as the Railroad elected to present. After the examination of the assessment and record and consideration of the additional evidence and insistences, the Board some days later fixed the assessment at the amount fixed by the Commission.

■■ The assessment so made by the Board is by Code Section 1535 made "conclusive and final" and "is not open to review by the courts" on the merits. *Nashville C. & St. L. Ry.* v. *Browning*, 176 Tenn. 245, 140 S. W. (2d) 781, 783, affirmed by the U. S. S. C., 310 U. S. 362, 60 S. Ct. 968, 84 L. Ed. 1254. Review may be had only by means of the common law writ of *ceritorari*, and is limited to an examination of the record made before the Board, such examination being permissible only for the purpose of determining whether it is disclosed by that record that the Board has acted illegally, fraudulently, or in excess of its jurisdiction. *State ex rel.* v. *Dixie Portland Cement Co.*, 151 Tenn. 53, 58, 267 S. W. 595; *Anderson* v. *Memphis*, 167 Tenn. 648, 652, 72 S. W. 2d 1059; *Nashville C. & St. L. Ry.* v. *Browning*, *supra*. In this connection, it is important

to keep in mind that "the good faith of the Commission and Board and the validity of their action are presumed; when assailed, the burden of proof is upon the complaining party." The *Browning Case, supra*, 176 Tenn. at page 253, 140 S. W. 2d at page 784. This rule makes it necessary, in determining the issues, to first state and then determine the Railroad's insistences.

In keeping with the requirements of the law as just above stated, the Railroad in December 1945 filed its petition for common law writ of *certiorari* in the Davidson County Circuit Court and in that petition charged the Board with having acted illegally, fraudulently and in excess of its jurisdiction in making this assessment. Specifically, the petition charged in substance that the record discloses (1) an assessment so far in excess of the actual cash value of its properties as to conclusively impute that which amounts to an intentional fraud upon the part of the Board, and (2) a systematic, intentional and long practiced discrimination against this and all other railroads in making assessments.

The above mentioned charge of discrimination is predicated upon the fact that properties of Railroads are assessed for *ad valorem* taxes by the Railroad and Public Utilities Commission, Code Section 1508 et seq., and its assessments then returned to the State Board of Equalization for its action thereon. Other properties are assessed in each county by a County Tax Assessor. Code Section 1336 et seq. The assessment lists made by the respective Tax Assessors are then certified to their County Boards of Equalization consisting of five members in each County, and it is the duty of this Board to examine, compare, fix and equalize the county assessments. Code Section 1419 et seq. These county as-

sessments then come under the jurisdiction of the State Board whose duty it is to equalize the assessments of all properties in the state. Code Section 1456. All property of every kind is required to be assessed at its actual cash value. Code Section 1349.

It is specifically alleged in the Railroad's petition for *certiorari* that the Commission assesses its property at what the Commission considered actual cash value, but that the county taxing authorities have systematically, deliberately and as a practice assessed the properties coming within their jurisdiction in amounts ranging from 40% to 80%, or perhaps an average of 60%, of actual cash value. It is then asserted that the State Board of Equalization has intentionally, systematically and as a practice failed to equalize the assessment of the Railroad's properties by reducing them to the average percent of value at which it is alleged that the county authorities assessed the properties coming within their jurisdiction; and that this alleged discrimination is a violation of its rights under both the Federal and State Constitutions. There is no charge of discrimination as between Railroads or other such public utilities.

The Board certified to the Circuit Court the record upon which the Railroad necessarily predicates its charges and moved thereafter that the Railroad's petition for *certiorari* be dismissed upon grounds, in substance, as follows:—

(1) The petition for *certiorari* filed by the Railroad in the Circuit Court and the record show that the railroad's "properties have been duly and legally assessed by the Railroad and Public Utilities Commission, as required by law, and that said assessment was appealed to the State Board of Equalization and there duly heard, ex-

amined and considered, and that the valuation set forth in the assessment complained of by (Railroad) was duly fixed and made and finally certified by the State Board of Equalization, as required by law, and the action of the State Board of Equalization in fixing the valuation set forth in the assessment complained of is conclusive and final''.

(2) There is no showing in the record of the proceedings with respect to the assessment that either the Commission or the Board did not comply with the requirements of law with reference to the method of making the assessment.

(3) The record in the proceedings upon the assessment entirely fails to show that either the Commission or the Board exceeded its jurisdiction or acted illegally or fraudulently.

The Circuit Court upon motion of the Railroad overruled this motion of the Board to dismiss the Railroad's petition and the Board excepted. There followed certain proceedings detailed in the current *Nashville C. & St. L. Case* and unnecessary here to repeat further than that this Court upon proper proceedings directed the Circuit Court to consider the case on the record of the proceedings before the Board as certified and filed by the Board and for the entry of such final judgment as it deemed proper upon that record.

In December 1947, the Circuit Court entered a final judgment, wherein it is recited that the allegations made in the Railroad's petition for *certiorari* are sustained and the assessment adjudged void. A remand to the Board for further appropriate proceedings was ordered. No opinion of the Court other than the recitations in the judgment was filed. The Board's motion for a new trial was overruled and the case is here upon its appeal.

It assigns as error the action of the Court in not sustaining and in overruling its motion to dismiss the Railroad's petition for *certiorari* for the reasons set out in the motion, and hereinbefore stated in substance.. The Railroad.responds by insisting that the record made before the State Board of Equalization discloses it as a fact under applicable law that the Board acted illegally, fraudulently and in excess of its jurisdiction in the particulars and with the alleged results hereinbefore stated.

In order to ascertain the amount of the assessment to be made, the Board first determined from the exhibits, schedules and information required to be furnished by the Railroad and other evidence in the record the value of this Railroad's entire system. This was found to be $383,715,506.00. Deducted from this figure was the value of all the Railroad's localized property which it found to be $32,165,047.00. Thus the value of its distributable property was ascertained to be $351,550,459.00. This total value of distributable property was apportioned to Tennessee on a system mileage basis. The system mileage was found to be 6,016.23 miles and 650.47 miles thereof in Tennessee. Localized property in Tennessee was assessed at $2,008,510.00. The assessment under attack, therefore, is:—

Distributable property in Tennessee $38,009,336.
Less exemption of $1000.00 .....∴. 38,008,356.
Localized property ..............:.... 2,008,510.

Total Assessment ............$40,016,866.

This distributable property was itemized with the value of each item specified. No complaint is made as to the valuation placed upon the localized property.

 It is insisted by the Railroad that the actual value of its entire system was $281,190,000.00 and that there

is no evidence in the record to sustain the Board's valuation of $383,715,506.00. If there is substantial evidence in this record in support of the Board's valuation, such evidence will preclude this Court from holding that the assessment is so far in excess of the actual value as to imply fraud upon the part of the Board, since the Court is not permitted to decide whether it thinks the evidence preponderates against the values fixed by the Board.

The net income of this Railroad for 1944 after deducting all taxes is recited by its financial report to be $22,261,814.00. Moody's Manual on "Railroads", 1945 Volume, shows the average yield of railroad bonds for the five year period ending in 1944 was 3.85%. A capitalization of the net income at that percent establishes a value of approximately $578,230,000.00 for this Railroad's entire system. It is the insistence of the Railroad, based upon financial results no longer obtainable, that the capitalization of income method of arriving at a valuation should be calculated upon a basis of 6%. Capitalized at 6%, the entire system valuation is approximately $371,016,000.00. It is further insisted that the Court assume the income of this Railroad will be substantially less for the biennium 1945-1946 and thereby conclude that the Board was guilty of an intentional wrong in not also so assuming, and in not capitalizing upon a 6% basis. This insistence is not logical.

In December of 1943 this Railroad's general statistician in a hearing before the Interstate Commerce Commission estimated the production cost of this Railroad system to be approximately $545,000,000.00 and the reproduction cost to be approximately $627,000,000.00. Although the Railroad is justified by precedent in its insistence that valuation of its properties for rate making

purposes is in excess of valuation for tax purposes, it is also true that this statistician at that hearing further testified that the above values fixed by him were on ''a conservative basis'' and that these properties ''could not be acquired today for the amount of money that they actually were acquired for''.

In 1944 this Railroad carried its capital stock on its books at a value of $189,200,000.00. These books also showed a surplus of $155,575,334.00, and the bonds were carried at par in the amount of $238,486,657.00. By this method of valuation the entire system is worth $583,881,-991.00.

Summarized, valuation determined by the above methods is:

| | |
|---|---|
| Capitalization of income at 3.85% .... | $578,230,000.00 |
| Capitalization of income at 6% ........ | 371,016,000.00 |
| Production cost method .............. | 545,000,000.00 |
| Reproduction cost method ............ | 627,000,000.00 |
| Stock and Bond method .............. | 583,881,991.00 |

An average of these five methods establishes an entire system valuation of approximately $541,000,000.00 as compared to the valuation of $383,715,506.00 fixed by the Board, or an assessment at approximately 71% of the value of the entire system.

In the financial statement of the Railroad made at close of 1944 it reported:—Total assets (less accrued depreciation of $65,099,045) amount to $703,690,521.00.

The highest previous assessment of the property in Tennessee of this Railroad was in 1920, the assessment being $39,570,385.00 as compared to the 1945 assessment of $40,016,866.00. At that time, according to the Railroad, it had more than 800 system miles of road in Tennessee. The Commission has found the number of such

miles in 1945 to be 650.47. The corporate surplus in 1920 was $46,974,374.00 as compared to a corporate surplus in 1944 of $155,575,334.00.

While the Railroad does not agree with many of the figures above stated, nevertheless, these figures were before the Board as a part of the record when it was considering the amount of the assessment, and it was permissible and proper for the Board to take these figures and any or all of the above methods of valuation into consideration in arriving at the amount of the assessment. Based upon these figures, the amount of the assessment was justified. It is not, therefore, reflected by the record that the assessment is so far in excess of the actual value of the property as to impute fraud.

■ Keeping in mind always that the validity of the Board's action must be presumed, it is now necessary to consider the Railroad's next insistence that the record discloses the Board to have assessed its property at what the Board considered actual value while the property of all other taxpayers except public utilities was assessed in accordance with a deliberate, systematic, and long practiced plan at an average of 60% of actual value, and that the Board intentionally and systematically refused to equalize the assessment of the Railroad's property with that of these other properties.

In support of this insistence of discrimination, the Railroad filed a considerable number of affidavits to the effect that County Tax Assessors and County Boards of Equalization assessed the properties coming within their jurisdiction at percentages ranging from 40% to 80% of actual value. These affidavits were made by real estate agents, bankers, lawyers and a large number of County Tax Assessors, and 91 of the 475 members

of the 95 County Boards of Equalization, and in some instances by other county officials. Turning to our largest county of Shelby, where Memphis is located, the charge is sought to be sustained by the affidavits of five real estate men. In our next largest county of Davidson, where Nashville is located, the affidavits of two real estate men, one of whom was a former deputy trustee, are filed in support of the charge. In our next largest county of Knox, where Knoxville is located, the insistence is supported by the affidavit of the tax assessor, one lawyer, four real estate and title insurance men and the county court clerk. In the next largest county of Hamilton, where Chattanooga is located, the affidavits are by the vice chairman of the Equalization Board, one banker, three real estate men, and two officers in a title guaranty company. One of these affidavits is to the effect that some of the property there is assessed at more than 100% and some around 50% of value. The affidavits in many of the smaller counties are by either the tax assessor, former tax assessor, or one or more members of the Board of Equalization and, in some instances, other present or former county officials. These affidavits vary considerably from county to county as to the percentage of actual value at which the property is assessed in the respective counties, and there is nothing in the record to indicate how much of the actual value of such properties in Tennessee is assessed at the highest percentage of 80% or how much at the lowest percentage, or how much at the percentages between this maximum and minimum. The insistence of the Railroad seems to be that the Board should have assumed an average percentage in value of all such properties in Tennessee to be 60% of actual value and,

therefore, should have assessed the Railroad's property at 60% of what it found to be the actual value of its property. In short, it is urged by the Railroad that a discrimination in its favor and against such as are assessed at more than 60% should have been made by the Board by assessing the Railroad's property at 60% of its value. The actual percent of the property in Tennessee which in the opinion of the affiants was valued at more than 60% as compared to the actual value of properties in Tennessee assessed in the opinion of the affiants at less than 60% does not appear in the record. It should also be observed in this connection that the county tax assessors and the County Board of Equalization take oath that they will assess, and subsequently, that they have assessed the properties coming within their respective jurisdictions at actual value. Code Sections 1343, 1375, 1435.

Hereinbefore there has been discussed the fact that in the record which was before the Board there is substantial evidence that the Board assessed the property of this railroad at approximately 71%, or less, of its actual value. In view of that evidence it cannot be accurately said that this record discloses the Board to have intentionally and as a matter of practice declined to equalize the assessment of this Railroad's property with that of other properties, even though face value be given to the opinions expressed in the various affidavits, and though there be indulged the arbitrary assumption that the assessment of these properties, on the whole, is at 60% of the total value of all such properties, as a whole, in the state. It is appropriate here to note that in the certificate of the Board transmitting its assessment back to the Commission pursuant to Code Section 1535 there appears this official recitation:—

"We have carefully weighed all evidence relating to equalization and have not only equalized the assessments as made by the Railroad and Public Utilities Commission, within the classes of property assessed by them, but we have also equalized such assessments with the assessment of all other property in the state assessed for *ad valorem* taxes."

Also, appropriate to and conclusive against the insistence now under consideration is the following statement in the opinion written for the Court by Mr. Justice GAILOR in the current case of *McCord, et al.* v. *Nashville C. & St. L. Ry.*

"The same argument brought forward with the same machinery, was discussed and disposed of against the Railroad's contention in *Taylor* v. *Louisville & N. R. Co.*, *supra*, 1898, 88 F. at page 361, and repeatedly thereafter with the same result until the *Browning Case* in 1939, 176 Tenn. at pages 258-260, 140 S. W. (2d) at pages 786, 787, where the question presented and the evidence used to support it, were so far identical with the present record as to make the issue *res adjudicata.*"

The next insistence of the Railroad is based upon the fact that prior to the assessment made by the Railroad and Public Utilities Commission, two of its three members made a personal inspection of some of the tracks, buildings and equipment of the Railroad. Code Section 1523 provides that the Commission may "take such additional evidence as to the value of any property to be assessed by them as may be deemed proper, but such additional evidence shall be reduced to writing and opportunity afforded, if desired, to the owner to submit additional evidence or counter-evidence to that required by said commission". During the hearing before the

Commission and in response to the query of one of the attorneys for the Railroad, these two commissioners stated that this "personal examination—entered into (their) judgment about the values of the properties", and that this was reflected in the "records of the Commission, the minute books which we keep, which are also our books on localized and distributable property".

It is asserted by the Railroad that such evidence as was acquired by such personal inspection was not reduced to writing as required by Code Section 1523; that, therefore, the assessment is void. *Louisville & N. R.* v. *Bate*, 80 Tenn. 573 is relied upon in support of this insistence.

The fact that this so-called inspection was inconsequential and not prejudicial is recognized by the following statement in the brief of the Railroad:—

"Manifestly, members of the Commission can no more estimate the value of Southern Railway Company by looking at its tracks and real estate in Knoxville or Chattanooga or Memphis than it could value the same property by a casual inspection of the limited facilities at Alexandria, or Orange, or Charlottsville, or Lynchburg, Virginia. It is equally true that members of the Commission cannot estimate the value of locomotives and cars by a casual examination of an occasional passing locomotive or car in Knoxville, or Chattanooga, or Memphis."

Furthermore, during the colloquy above referred to as to this matter, the chairman of the Commission stated to the attorney for the Railroad that if he would "proceed with the presentation of what you have in mind, calling our attention to errors which we have committed, we will be glad to hear you". In course of reply, this attorney

264

said "I won't involve you regarding placing in the record the basis of your personal conclusions". The Railroad thereby seems to have waived this asserted irregularity; no doubt, because of a realization that the inspection was necessarily without importance in that no conclusion as to the value of the Railroad's system could be substantially influenced thereby.

Also of controlling importance is the fact that a hearing *de novo* before the State Board of Equalization was had, and there the Railroad was allowed to introduce such new and additional evidence as it desired. These two members of the Railroad Commission were present at this hearing. The Railroad made no offer there to examine either of them.

None of the elements above mentioned existed in the *Bate Case* relied upon by the Railroad. In that case the record showed "the values fixed by the Board in excess of that shown by the proof". Nor did "it appear that the parties had notice of the taking of the depositions, or some of them at least, which appear in the record". Nor was "an opportunity to cross-examine allowed to the parties in interest". Neither was there a waiver of the exception. On that point the Court in that case said with reference to some of the exceptions that "we cannot hold the assessors have erred upon a question not submitted to them, especially when the exceptions substantially waive it". (See 80 Tenn. at pages 574, 578, 579.) Nor was there any hearing *de novo* before the State Board of Equalization in that case. For each of the reasons stated, the *Bate Case* does not seem to support the Railroad's insistence. And above all this is an inescapable conclusion, and it seems to be so conceded, that no prejudice could have resulted from this inspection.

■ In accordance with Code Section 1508 requiring the assessment of the Railroad's properties in even years, this property was assessed in 1944 for the 1944-1945 biennium. The Legislature in 1945 by Chapter 17 of the Public Acts amended this Code Section so as to require the assessment of these properties in odd years. Accordingly, this property was assessed for the 1945-1946 biennium. The assessment was at a quite substantially higher figure than that made in 1944. It is the insistence of the Railroad that, in any event, the assessment for 1945 is invalid because (1) the 1945 Act reflects no legislative intent that the Railroad's properties already assessed in 1944 for 1945 be again assessed for 1945, and (2) that had such been the intention of the Legislature, it was without authority to again assess the property for 1945.

The first insistence is thoroughly discussed and disposed of contrary to the insistence of the Railroad in the current case of *McCord et al.* v. *Nashville C. & St. L. L.*, *supra*. What is there said applies here, of course.

Chapter 17 of the Public Acts of 1945 changing the assessment from even to odd years was enacted on February 6, 1945. On the same date, the Legislature enacted Chapter 18 so as to amend Code Section 1509. By that Code Section, the Railroads were required to file on or before the first day of April biennially in even years schedules and statements containing certain information with reference to their properties. The amendment made by Chapter 18 after inserting the word "odd" in lieu of the word "even", then provided that "For the year 1945 only" the Railroads "shall be allowed to . . . not later than June 1st, but thereafter . . . not later than April 1st in odd years" to file these schedules and statements. Then on February 27, 1945, there was en-

acted Chapter 134 requiring the Commission in its assessment to describe with value stated specified items of the properties of the Railroads in the State. This was substantially more than had previously been required by Code Section 1529 amended by this chapter. All three of the Public Acts referred to provided that they take effect immediately, "the public welfare requiring it". Article 2, Section 20 of the Constitution provides that:—"No law of a general nature shall take effect until forty days after its passage, unless the same or the caption thereof shall state that the public welfare requires that it should take effect sooner." Taking all of these facts into consideration, it seems illogical not to conclude that it was the legislative intent to require a new assessment for the year 1945, as well as for the year 1946. As pointed out in the *McCord* v. *Nashville C. & St. L.* case, this conclusion is forcefully substantiated by historical interpretation and practice. In 1897, 1919, 1921 and 1932 change in the year for making the biennial assessments was had. In each instance the assessment was "made and tax collected under the changed law in the year of its enactment by the Legislature".

It is said in the brief of the Board that in 1921 and 1932 the new assessment reduced the amount for which the property of this Railroad was assessed and the Railroad accepted the reduction without question and paid upon the new assessment. This is important only in reflecting the construction heretofore placed upon the legislative intent in making such changes.

As said in the current *McCord* v. *Nashville C. & St. L.* case, applicable to the question now under discussion is the holding of the U. S. Circuit Court of Appeals with reference to the Tennessee assessment in *Tay-*

lor v. *Louisville & N. R. Co.*, 6 Cir., 88 F. 350, 360, wherein Judge TAFT said that although ''The act of 1897 does not expressly annul the assessment of the old board, but we think that such annulment is necessarily implied''. The Railroad states a fact when it says that this decision of an intermediate Federal Court is not binding upon this Court. However, such eminent authority is highly persuasive. The Railroad's assertion that this holding of the Federal Court is dictum because the assessment was held void on another ground is not sustained by precedent. The question was made in the case as to whether the previous assessment was annulled by the 1897 Act. The decision of the question was not, therefore, dictum. ''Two or more questions properly arising in a case under the pleadings and proof may be determined . . . neither holding will be a dictum so long as it is properly raised and considered.'' *McFarland* v. *Bush*, 94 Tenn. 538, 541, 29 S. W. 899, 900, 27 L. R. A. 662, 45 Am. St. Rep. 760.

Since the 1945 Act does reflect a legislative intent for a new assessment effective for the year 1945, it is necessary to consider the Railroad's insistence that the Act, in so far as it seeks to annul the 1945 assessment made in 1944, violates the Railroad's constitutional right under Article 11, Section 8, by directing a reassessment of the properties of the railroad, which had already been assessed, while under the general law carried in Code Section 1497 such reassessment of other properties is forbidden, and also violates its rights, so it is asserted, under Article 1, Section 8, providing that no person shall be deprived of his property other than by the ''law of the land''.

Section 1497 is carried under Article 10 of the Code, that Article being entitled ''Back Taxes, Assess-

ment, Collection and Limitation of". That article deals exclusively with the duties and powers of the taxing officials created by law. Therefore, when in Code Section 1497 under this article it was provided that no back assessment or re-assessment shall be made against property already regularly assessed except in case of fraud or escaped taxes, the prohibition thereby imposed was upon the taxing officials. Section 1497 was considered by this Court in *Swift & Co.* v. *Hailey*, 142 Tenn. 382, 219 S. W. 1039 and in the case this Court said that by reason of Section 1497:—"In the absence of statutory authority no right exists to re-assess property where it has been once assessed in the manner prescribed by law." (142 Tenn. at page 388, 219 S. W. at page 1041). In the instant case there is "statutory authority" to re-assess the Railroad's property for 1945, that statutory authority and, in fact, mandate, being Chapter 17 of the Acts of 1945 hereinbefore discussed. As aptly said in the Board's brief, the Legislature provides the time of the assessment. It may change that time and re-assess if it deems such action desirable. There is no vested right in an assessment for taxes.

 The assessment for taxes and the collection thereof is a governmental function. With reference to revenue statutes, a very wide discretion is conceded the Legislature. If any reason be conceived to justify a classification in such matters it is upheld. *Ogilvie* v. *Hailey*, 141 Tenn. 392, 396, 210 S. W. 645. One who assails the classification has the burden of showing that it does not rest on any reasonable basis. *Lamb* v. *Whitaker*, 171 Tenn. 485, 490, 105 S. W. (2d) 105. Mr. Justice FRANKFURTER in *Nashville C. & St. L.* v. *Browning, supra* [310 U. S. 362, 60 S. Ct. 972], called attention to the fact

that railroads, "unlike farms and city lots and stocks and bonds, are not objects of exchange", and that "The very notion of a 'full cash value' for a railroad is in many respects artificial". In *Haggar Co.* v. *Commissioner of Internal Revenue*, 5 Cir., 104 F. (2d) 24, 27, it was said with reference to property of the character of a railroad that its value fluctuates and when once determined "is subject to change between the time of its determination and the filing date of the return". These and other reasons may be conceived as to why the Legislature by Chapters 17 and 18 of the Public Acts of 1945 required a reassessment for 1945 of the properties of public utilities, of the character of railroads, while such re-assessment as to other properties subject to *ad valorem* taxation could not under Code Section 1497 be so re-assessed. Not only, therefore, is the classification reasonable, but the attack made upon its constitutionality under Article 11, Section 8 must yield to the rule that one who assails the classification must carry the burden of showing that it is essentially arbitrary. *McConnell* v. *City of Knoxville*, 172 Tenn. 190, 194, 110 S. W. (2d) 478, 113 A. L. R. 966; *Lamb* v. *Whitaker*, *supra*.

 Finally, it is insisted that the Board erroneously assessed 1.86 miles of track at Briceville and 2.25 miles of track at New River as main track when it should have been assessed as side track. Main track is assessed at $20,000.00 per mile and side track at $15,000.00 per mile.

The question is by no means free of difficulty. The Interstate Commerce Commission has classed this as side track. The Railroad has so returned it. For ten successive years State Commissions and Boards, over the protest of the Railroad, have regularly classed it as main track. It was in doing so that it found the figure of

6,016.23. as the system mileage. The Railroad makes no objection to this figure as the system mileage, and does not insist that it should be less, as would presumably be the case, if classed as side track, with the resulting dollars increase per system mile. If side track, then the system mileage in Tennessee would be 646.56. The Railroad in its brief concedes a system mileage in Tennessee of 647.12. Its map discloses these tracks leading to these places. The Board has consistently concluded for years from the evidence that this mileage is main track, or by reason of its location has that value, and thus should be so classed. Evidently, the Railroad has considered this conclusion not to be without some foundation, for it has consistently submitted to this classification. However, it may likewise be reasonably said that the Railroad considered the matter too trivial for litigation, except in connection with larger issues. Evidently, the successive Boards for years have not considered it equitable to class this particular mileage as side track, but have thought it should be treated as a part of the main line system to which it belonged. By reason of the limited review to which the Court is restricted, it cannot substitute its opinion of the matter to that of the Board. It can only determine whether the record discloses the Board, the validity of whose action is presumed, to have acted fraudulently, illegally or in excess of jurisdiction. The record does not so disclose such conduct upon the part of the Board in its classification for tax purposes of the track in question.

The conclusion of this Court is that the record made before the Tennessee Board of Equalization does not disclose that this Board acted illegally, fraudulently or in excess of jurisdiction in fixing the attacked assessment

of the properties in Tennessee of this Railroad. Hence, it is necessary to sustain the Board's assignments of error, reverse the judgment of the Circuit Court, sustain the Board's motion made in the Circuit Court to dismiss the Railroad's petition for *certiorari*, dismiss the petition for *certiorari*, and assess all costs in both Courts against the Railroad.

Neil, C. J., dissents.

## Dissenting Opinion.

Mr. Chief Justice Neal delivered the dissenting opinion.

The issues involved in this and companion cases are vital to these taxpayers and also the State. I fully realize the grave responsibility which rests upon this Court, and each member thereof, in deciding these important cases. In assuming my individual responsibility, I am debtor alone to my own conscience and must act accordingly.

I will later refer to the State Board of Equalization as the "Board" and to the Railroad and Public Utilities Commission as the "Commission." In my judgment the valuation of these properties by the Commission and certified to the Board for *ad valorem* taxation is illegal; that the method adopted by the Commission, and which was later approved by the Board, was in violation of the statute. The action of the Commission in determining assessed valuation was known to the Board to be preconceived, arbitrary, and without authority of law.

It is not necessary to pass upon alleged overvaluation as evidence of constructive fraud in making assessments,

although such valuation might be looked to in determining the question of equalization of assessments.

The record reveals without contradiction that long prior to fixing the amount of these assessments two members of the Commission, Leon Jourolman and Samuel S. Pharr, publicly announced that assessments against all railroad properties for the biennium 1945-1946 *would be greatly increased.* At that time no railroad had filed any return as to the value of any property as required by law. The record further shows, also without contradiction, that these two Commissioners made extensive inspection of railroad properties throughout the State, including both localized and distributable property, and that they failed and refused to place upon record, *as required by statute,* the nature of the property inspected and where it was located. The record fails to show where they went on their inspection tours or what they saw; and the said Commissioners admitted that their judgment had been definitely affected as a result of personal inspection.

The only claim made by the Commission that the result of personal inspection was reduced to writing is found in the following statement of the Chairman. When asked if he had reduced the results of his inspection to writing, he replied, ''Certainly the records of the Commission, the Minute Books which we keep, which are also our books on localized distributable property, reflect the results of our investigation.'' This simply begs the question altogether. No member of the Commission points to any particular property that was personally inspected and there is no writing filed as to any value fixed thereon as a result of any such inspection.

In this situation these railroad taxpayers were deprived of their right to introduce any evidence to dis-

prove the results of these official inspections. Code sec. 1523.

Following the tentative assessment by the Commission, the railroads were given notice that all exceptions must be filed on or before August 16, 1945, and that all hearings on exceptions would be held on August 17, 1945. It is alleged in the petition for *certiorari* (and it is not contradicted by the record) that on August 17, 1945, the Commission disposed of about 200 exceptions which had been filed by various railroads and utilities; that the railroads here involved requested an opportunity to offer additional evidence, *which was twice refused*. It thus appears that these companies were illegally and wilfully denied their right to offer proof in contradiction of values fixed by the Commission. Later the Commission appeared before the State Board and made a motion to strike the several appeals for review of these assessments, seeking thereby to prevent any hearing whatever of their action in the premises.

The mere fact that this motion was overruled, and there was a hearing *de novo*, does not remove the stigma of illegality from these assessments, since the Board expressly ratified and approved everything that had been done, holding that each and every assessment made was correct, without the reduction of as much as one penny.

Under our statute an assessment is void for illegality if made on the basis of a personal inspection of officers who did not reduce to writing and put in the record the evidence so obtained. *Louisville & N. R. Co.* v. *Bate*, 80 Tenn. 573. The statute, Section 4, Acts of 1877, that was under consideration in this case, was quite similar in its provisions to the statute governing the assessment of railroad property by the present Commission. Thus the

Act of 1877 provided: "That all proof taken by said assessors shall be reduced to writing, and be sworn to and signed by the parties."

Our present statute (Code sec. 1532), requiring the Commission to file and preserve proof taken by it, provides: ". . . and they shall have carefully preserved and *filed away* all reports, documents, and *proof taken and used by them*, and which shall be public records, *subject to inspection by the taxpayer* under reasonable regulations." (Emphasis supplied.)

This Court, in commenting on the failure of the Commission to comply with the Act of 1877, said:

"It may be the assessors based their estimates of value upon their *personal knowledge, formed from inspection and examination*. This they might have done, *but like all other testimony it should have been reduced to writing, and an opportunity to cross-examine allowed to the parties in interest*." (Emphasis supplied.) *Railroad* v. *Bate,* 80 Tenn. 573.

We think the language thus used in the *Bate Case* is most persuasive when we come to apply it to Code sec. 1532 above quoted. This section of the Code expressly requires the Commission to "file a-way" all the evidence "taken and used by them," and is made subject to "inspection by the taxpayer." I construe this as a positive mandate upon them to reduce to writing the result of their personal inspection to the end, as said in the *Bate Case*, that the "parties in interest" be given an "opportunity to cross examine" them, and to offer proof in rebuttal. The evil resulting from a failure to file a full report of the property inspected is the taxpayer would have no way of knowing what the taxing official considered in arriving at an assessed valuation of the property.

The case of *Railroad* v. *Bate*, and the reasons underlying the decision, finds support in *Interstate Commerce Commission* v. *Louisville & N. R. Co.*, 227 U. S. 88, 33 S. Ct. 185, 57 L. Ed. 431; *Ohio Bell Tel. Co.* v. *Public Utilities Commission*, 301 U. S. 292, 57 S. Ct. 724, 81 L. Ed. 1093.

In *Interstate Commerce Commission* v. *Louisville & N. R., supra*, it was said [227 U. S. 88, 33 S. Ct. 187]:

"In such cases the Commissioners cannot act upon their own information, as could jurors in primitive days. *All parties must be fully apprised of the evidence submitted or to be considered*, and must be given opportunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal. *In no other way can a party maintain its rights or make its defense.*" (Emphasis supplied.)

In *Ohio Bell Tel. Co.* v. *Public Utilities Commission, supra*, it was held [301 U. S. 292, 57 S. Ct. 728]:

"The fundamentals of a trial were denied to the appellant when rates previously collected were ordered to be refunded upon the strength of evidential facts not spread upon the records."

Mr. Justice CARDOZO expressed strong disapproval of this procedure in the following language: "This is not the fair hearing essential to due process. It is condemnation without trial." Conceding that the Commission was clothed with broad discretionary powers and "exempt from supervision" if certain "[legal] restraints have been obeyed", he says: "All the more insistent is the need, when power has been bestowed so freely, that the 'inexorable safeguard' (*St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 73, 56 S. Ct. 720, 735, 80

L. Ed. 1033) of a fair and open hearing be maintained in its integrity.'' (Citing cases.)

In the *Ohio Bell Telephone Case, supra,* the Commission "reported its conclusion, but not the underlying proofs.''

The situation confronting us in the instant case is analogous to that which was expressly found in the *Ohio Bell Telephone Case* by Justice Cardozo.

The majority of the Court, for whom I entertain great respect, seem to be of opinion that the question of "personal inspection'' of the property is of little moment. But to my mind it involves the fundamental right of the taxpayer to be heard in protest against an excessive or illegal assessment. I am more than ever convinced of its importance in the light of the greatly increased assessment upon the defendant's property over and above any previous assessment.

I am well aware of the holding of this Court in *Nashville C. & St. L. Ry.* v. *Browning,* 176 Tenn. 245, 140 S. W. (2d) 71, that there can be no review of the action of any taxing authority except to determine if such authority acted illegally, fraudulently, or exceeded its jurisdiction. I make reference to the excessive amount of these assessments over previous assessments as showing the importance of requiring that the taxing authority comply with the statute and disclose to the public, and especially the taxpayer, every material fact upon which an assessment is made. If this is not done, it amounts to a denial of due process.

I think the assignments of error should be overruled and the judgment of the trial court affirmed.