McCord *et al. v.* Nashville, Chattanooga & St. L. Ry.

(*Nashville,* December Term, 1947.)

Opinion filed May 3, 1948.

278

Roy H. Beeler, Attorney-General, William F. Barry, Solicitor-General, and E. J. Walsh, of Nashville, and Hamilton E. Little, of Memphis, for plaintiffs in error.

William H. Swiggart, Edwin F. Hunt and Walker & Hooker, all of Nashville, for defendant in error.

MR. JUSTICE GAILOR delivered the opinion of the Court.

This appeal presents for determination the validity of the assessment of properties in Tennessee, of the Nashville, Chattanooga & St. Louis Railway for *ad valorem* taxation for the biennium 1945-1946. The assessment was made under authority of sections 1508 through 1540 of the 1932 Code of Tennessee, as it was amended by certain Acts of the Legislature of 1945. Plaintiffs in Error will be referred to herein as "The Board," and the Nashville, Chattanooga & St. Louis Railway will be referred to as "The Railway" or "Taxpayer," and the Railroad & Public Utilities Commission as the "Commission."

In considering the appeal a brief review of the somewhat unusual and complex steps taken in the litigation below is unavoidable. After the assessment of the Railway properties had been completed by the Commission, an appeal was taken by the Railway to the State Board of Equalization. After a hearing *de novo* before the Board, introduction of the evidence and record made before the Commission, new evidence and argument of counsel which lasted from day to day, from October 2, 1945, until October 15, 1945, the Commission's assessment was approved by the Board and certified back to the Commission as the final assessment (Code sec. 1535). The assessment is as follows:

> Tennessee localized property ....... $ 3,469,994
> Tennessee distributable property ... 31,886,680
>
> ———————
>
> Total assessment (less $1000 exemption ........................ $35,355,674

The Railway then filed petition for *certiorari* in the Circuit Court of Davidson County, seeking judicial re-

view, not only of the legality of the assessment, but of the valuation of the property upon which it was based.

Petition for *certiorari* was met by a written motion of the Board to dismiss on numerous grounds, among which were,—that the petition for *certiorari* showed on its face that the assessment had been regularly and legally made; that it failed to show that the Board had acted illegally, arbitrarily, fraudulently or in excess of its jurisdiction. The case was then heard by the Circuit Judge on the petition for *certiorari*, the full transcript and record of the proceedings had before the Railroad and Public Utilities Commission and the Board of Equalization, and upon the motion to dismiss. As a result of this hearing the Circuit Judge overruled the motion to dismiss and ordered the Board to make further defense.

The Board then filed motion for new trial seeking to have the Court set aside and vacate the order overruling its motion to strike the petition for *certiorari*. To this motion for a new trial the Railway replied with a motion to strike on the ground that there had been no final judgment. After argument of the motion for a new trial and motion to strike, the Court sustained the motion to strike and denied the Board the right to appeal on the ground that the orders theretofore entered in the cause were interlocutory and not final.

The Board then asked leave to file and time for filing a bill of exceptions or wayside bill of exceptions. This motion, too, was overruled, the Court denying the Board the right to have time to prepare and file a bill of exceptions or to appeal. Thereupon the Railway moved for judgment by default for failure of the Board to plead further, in accordance with the order of Court overruling motion to dismiss the petition for *certiorari*. Refusing

the Board's application for time and to defer action on the motion for judgment by default until the presentation of questions already raised could be made in the Supreme Court, the Circuit Judge granted the motion for judgment by default and ordered that the petition for *certiorari* and the averments thereof be taken as confessed, and that the cause be set for hearing ex parte as to the Board. The Board then prepared and tendered its wayside bill of exceptions or bill of exceptions, and the Circuit Judge refused to grant the Board any bill of exceptions or wayside bill of exceptions.

Thereupon the Board presented to an Associate Justice of this Court, separate petitions (1) for a writ of *mandamus* to require the Circuit Judge to allow a bill of exceptions or wayside bill of exceptions, (2) for writs of *certiorari* and *supersedeas* to review and set aside the aforesaid action of the Court in overruling its motion to dismiss, in sustaining petition for *certiorari*, and in striking the Board's motion for a new trial. By consent, petition for *mandamus* was disposed of by an order permitting the Board to file its wayside bill of exceptions, which was duly done. Petition for *certiorari* and *supersedeas* was considered by this Court and granted. As a result, the judgment by default rendered in the Circuit Court was set aside and the cause remanded for a hearing on the record of the proceedings before the Board as certified and filed by the Board in the Circuit Court, and for the entry by the Circuit Court of a final judgment.

Thereafter the cause was finally heard in the Circuit Court, the Judge rendered no opinion and stated no grounds for his action, but held (1) that the petition for *certiorari* should be sustained, and (2) that final judgment should be entered sustaining all averments of ille-

gality made in the petition for *certiorari*, and adjudging that the assessment of the Railway properties for 1945 for *ad valorem* taxation was illegal, null and void; that the assessment should be quashed; that the assessment of the Railway properties for the biennium 1945-1946 be remanded to the Board for such further proceedings as are authorized by law. Motion by the Board for new trial was made and overruled, the wayside bill of exceptions and the bill of exceptions setting forth the proceedings had in Circuit Court after *procedendo* on *certiorari* and *supersedeas,* were filed and an appeal prayed and granted.

The case is now before us after elaborate and extensive argument, voluminous briefs and the entire record, including all proceedings before the Railroad and Public Utilities Commission, the Board of Equalization, and the Circuit Court.

We were forced to make this lengthy statement of the history of this litigation on account of this state of the record and the extent to which various legal and factual questions have been presented and argued in the briefs filed. However, the only real question for our determination is whether or not the petition for *certiorari* filed by the Railroad in the Circuit Court was on its face sufficient to warrant or justify judicial review of the assessment as finally made by the State Board of Equalization. To justify or warrant such review it must appear that the assessment as finally certified was action illegal, arbitrary, or fraudulent. Illegality includes the question of jurisdiction and authority.

In its brief the Railroad insists the assessment was illegal:

"(1) Because so grossly excessive as to be a constructive fraud and because made in an arbitrary, capricious and unfair manner;

"(2) Because in excess of any valuation established by the record, and hence constructively fraudulent;

"(3) Because made in violation of statute on the basis of personal inspection, investment cost and a former pretended assessment and by the inclusion of the value of non-taxable securities;

"(4) Because petitioner's constitutional right to equalization was denied;

"(5) Because, as to the year 1945, a prior assessment for such year had been made and certified in 1944 and had become a lien on petitioner's property as of January 10, 1945, prior to the making of the challenged assessment or the passage of the statute which allegedly authorized it and such prior assessment remained effective."

From the broad scope of matters presented in briefs and arguments of this case under a proposed elaboration of the foregoing summary, it seems necessary to state again that this Court is not a Board of Tax Appeal and that so far as the Legislature is concerned, no duty has been imposed on this Court in relation to the assessment of property of public utilities; that the present appeal is before us on common law writ of *certiorari* under section 9008 et seq. of the Code, as those sections have been limited and defined in *Anderson* v. *Memphis*, 167 Tenn. 648, 72 S. W. (2d) 1059; *W. J. Savage & Co.* v. *Knoxville*, 167 Tenn. 642, 72 S. W. (2d) 1057. On this *certiorari* the Court's jurisdiction is "supervisory" not "appellate," *State ex rel.* v. *Hunt*, 137 Tenn. 243, 250, 192 S. W. 931, and *certiorari* does not lie to have judicial review of the action of the State Board of Equalization

"on the merits." *State ex rel.* v. *Dixie Portland Cement Co.*, 151 Tenn. 53, 267 S. W. 595; *The Press, Inc.*, v. *Washington County*, 179 Tenn. 435, 439, 167 S. W. (2d) 329.

■■ The assessment and collection of taxes is an administrative and not a judicial function. The Legislature has created the Railroad & Public Utilities Commission, whose three members are elected by all the people of the State to give their full time and constant attention to the regulation and control of railroad and other public utilities. As such public officers one of their duties is to assess *ad valorem* taxes to be paid by these corporations. The Commission makes the assessment on the taxpayer's return in the form and giving consideration to the elements of value laid down in Code secs. 1508 through 1533, as amended by Chapters 17, 18, 19 and 134, Public Acts of 1945. Nowhere has the Legislature laid down a prescription or formula for the Utilities Commission to follow in arriving at "actual cash value" which is the prescribed amount of the assessment.

■ The Board of Review and Appeal (Code sec. 1534 et seq.) for the assessment of the Commission is the State Board of Equalization, which is reasonably composed of the Governor as the Chief Administrator and Executive, and other heads of the Chief Administrative Departments of the State. In performing its function of review and appeal, the Board is authorized (may) "increase or diminish"; may seek and obtain new evidence; but all of the evidence shall be considered by the Board "in support of the assessment so fixed by said commission." (Code sec. 1534.) From a study of the entire section 1534, and the first sentence of section 1535:

"On or before the third Monday in October, said board of equalization shall certify to the commission the valu-

ation fixed by it upon each property assessed under this law, and the action of the board of equalization in fixing the valuation upon such property shall be conclusive and final and the valuation so fixed shall be assessed against said property and the taxes due thereunder be paid." It is clear that with the certificate of the Board of Equalization the tax assessment machinery as such, has served its purpose and run its course. After the Board's certificate the right of appeal is expressly cut off by the Legislature, and this was within legislative power. *McKee v. Board of Elections*, 173 Tenn. 276, 288, 116 S. W. (2d) 1033, 117 S. W. (2d) 755.

■ The Legislature has put the full, final and conclusive duty of tax assessment on the Commission and the Board of Equalization, and since there is nothing in the Constitution to deny the assignment, the Courts have no right to interfere with the result unless it has been reached by departure from constitutional provisions or statutory law.

In the present case both sides have departed far from the limited scope of this legitimate judicial review, but by analysis of the five points of illegality quoted from the Railroad's brief above, it appears that judicial review of the assessment is sought on assertion of the following illegalities:

"1. That the assessment was made and taxes collected for 1945 by an illegal construction of Chapters 17, 18 and 134 of the Public Acts of 1945.

"2. That the State Board of Equalization failed to equalize and that, therefore, the Railroad was denied its constitutional right of equality with other taxpayers.

"3. That the assessment fixes value so grossly excessive as to constitute constructive fraud, and require this Court to nullify the assessment."

We consider these three allegations of illegality.

(1) Prior to the enactment of Chapters 17, 18 and 134 of the Public Acts of 1945, under section 1509 of the Code, the Railroad was required to file a schedule before April 1 of the even years for the assessment of its property for the year of the return and the succeeding odd year. The assessment was completed in October of the year of the return. Taxes were collected on the assessment for the year that the schedule was filed and also for the next year. In other words, a schedule was filed in 1944, and assessment made in 1944, and taxes collected for 1944 and 1945 on the basis of that assessment. By Chapter 17 of the Public Acts of 1945 the law was amended to require this biennial assessment in the ''odd'' and not the ''even'' years. By Chapter 18 the Railroad was required to file the schedule in the ''odd'' and not the ''even'' years, but Chapter 18 contained this provision which we consider determinative of legislative intent:

''For the year 1945 only all railroads and public utilities required to file schedules and statements shall be allowed to do so not later than June 1st, but thereafter said schedules and statements shall be filed not later than April 1st in odd years as now provided.''

Under established practice, if the Legislature had intended that the 1944 assesment should remain in force and 1945 taxes be collected thereon, there would have been no reason to require the Railroad to file a schedule in 1945 at all. The Legislature would not have used the language it did use, but would have provided that taxes for the year 1946 be collected for a single year and not on a biennial basis. Further, after the passage of Chapter 134 of the Public Acts of 1945, and the new require-

ments there made for a legal assessment, a new assessment was immediately necessary. Historical consideration of the practice established under former changes in the law is persuasive and justifies a conclusion that if by the amendments of 1945, the Legislature had wished to depart from the practice established under former amendments, it would have expressed an intention to do so. Since the creation of the Commission in 1897, there have been four changes in the year for making the biennial assessment of railroads, and in each of the four cases the change has been given effect immediately, and the assessment made and tax collected under the changed law in the year of its enactment by the Legislature. These changes occurred in 1897, 1919, 1921, and 1932. When the change was made in 1897, the effect of it was to annul by implication, an assessment which had already been made for 1897 under an old law. In an opinion reaching the result we reach here, the Circuit Court of Appeals, over the objection of the railroads, held that by implication the new law annulled the assessment already made, and required a new assessment for the year the law was changed. *Taylor* v. *Louisville & N. R. Co.*, 88 F. 350, 359. A study of the entire opinion in this Federal case reveals much other reasoning by its author, the late Chief Justice, then Circuit Judge, WILLIAM HOWARD TAFT, which confirms our conclusion here. In disposing of a contention of the Railroad identical with that made in the present case, he said:

''Another objection to the validity of defendants' action is that they have made an assessment for the year 1897 without lawful authority. The state board of equalizers and tax assessors created by the act of 1895 had made an assessment of the valuation of railroads for the

year 1897, and it is contended that this is the valid assessment. The act of 1897 does not expressly annul the assessment of the old board, but we think that such annulment is necessarily implied."

Finally, the new requirements for legal assessment made by Chapter 134 of the Public Acts of 1945, clearly indicate that a new assessment was immediately necessary. All three of the amendatory Acts, Chapters 17, 18 and 134 were by the "emergency clause" made effective from and after their passage. Of course, had the Legislature so intended, they might have been made to be first effective for the assessment for the year 1946.

(2) It is next insisted that because the Board did not change the Commission's assessment figures, that it did not perform its function of equalization. It is insisted that the Board approved an assessment of the Railroad's distributable properties at 100 per cent of their full and actual value, whereas local assessments of individual properties in counties were approved though made at varying percentages less than 100 percent. We find no fact in the present record legally to distinguish the question as here presented from the same argument which has been made, and without exception, decided against the taxpayer in many of our reported cases since the Constitution of 1870 presented the dilemma (Art. II, sec. 29) that "all assessments should be equal and uniform," and yet "that every species of property should be assessed at its actual cash value." *Taylor* v. *Louisville & N. R. Co., supra; Carroll* v. *Alsup*, 107 Tenn. 257 288, 64 S. W. 193; *Nashville, C. & St. L. Ry.* v. *Browning*, 176 Tenn. 245, 140 S. W. (2d) 781. In the present brief and argument, the Railroad asserts repeatedly that as a Railroad, its distributable property has been assessed

at actual cash value, while property of citizens other then railroads, have been assessed at 60 percent or less of their actual cash value. The argument is summarized in the following excerpts from the Railroad's brief:

"(a) The assessment of the property of this Railway was made at its actual cash value as fixed by the Assessors. . . .

"(b) Property generally is intentionally and systematically assessed at a percentage of actual cash value, substantially less than actual value."

There is no assertion or claim that there has been discrimination against the Nashville, Chattanooga & St. Louis Railroad when compared with the assessment of other railroads. Nor is it claimed that the property of this Railroad has been assessed at a higher rate than similar properties of other railroads.

■■■ "When he (taxpayer) comes into court asking relief of his own assessment, he must be able to allege and show that his property is assessed at more than its actual cash value. He may come before an equalizing board, or perhaps before the courts, and show that his neighbors' property is assessed at less than its actual value, and ask to have it raised to his own, if his is at the cash value; and in this way the courts, legislatures, and taxpayers will cooperate to tax all property at its actual cash value, and to make all taxes equal and uniform, as the constitution contemplates. The actual cash value is the only practicable basis upon which taxes can be made equal and uniform, and this is clearly the constitutional provision, the legislative intent, and should be the effort of the court, as well as taxpayers." *Carroll v. Alsup*, 107 Tenn. 257, 292, 64 S. W. 193, 202.

In its final analysis, this argument of the Railroad amounts to this. The Governor and other members of

the Board, constituting the highest administrative officers of the State, have obeyed the law in the case of the Railroad here, by assessing its property at actual cash value, as the Constitution prescribed and the law directs, but the Supreme Court is asked to nullify this legal action because certain local accessors have not obeyed the law in other cases. Neither the local assessors nor the favored property owners are parties to this cause. Obviously the parties against whom a judgment might be rendered on account of illegal action are not before the Court. The same argument brought forward with the same machinery, was discussed and disposed of against the Railroad's contention in *Taylor* v. *Louisville & N. R. Co,. supra*, 1898, 88 F. at page 361, and repeatedly thereafter with the same result until the *Browning Case* in 1939, 176 Tenn. at pages 258-260, 140 S. W. (2d) at pages 786, 787, where the question presented and the evidence used to support it, were so far identical with the present record as to make the issue *res adjudicata.*

In making assessment of the properties of the Railroad, properties are divided into two categories,—distributable, Code sec. 1527, and localized, Code sec. 1529. The Railroad's localized properties were assessed on advice of local assessors (cf. *Browning Case, supra*), and since the Railroad does not complain of the assessment of its localized property in Tennessee, we may assume that the localized properties were assessed at the same percentage of value as that fixed for other similar properties in the localities.

As to the distributable property, no complaint or suggestion is made that such property of the N. C. & St. L. has been assessed at a higher rate than that of any other railroad, or that there has been discrimination against this Railroad in favor of any other.

█ It is clear that as a "species" (Constitution, Art. II, sec. 29) railroad distributable property is *sui generis* and presents unique difficulty for the assessor. There is no "market overt" by which the value of such railroad property may be established, and in the present case the same fact is true of the stocks and bonds of the N. C. & St. L. Railway, because 72% of its stock is owned by the L. & N. R. R. No doubt, in recognition of this difficulty, the Legislature directed the Commission to consider certain factors in reaching its assessment (Code 1526). The Commission formally assert that they did consider these factors in the present case. The conclusion reached from such consideration is obviously beyond our review.

Value is not only a matter of opinion (*Nashville, C. & St. L. Ry.* v. *Browning*, 176 Tenn. 245, 252, 140 S. W. (2d) 781), but also of purpose. In the present case the purpose being taxation, the Railroad's attorneys say the value of its entire system in Tennessee and elsewhere, is approximately $35,000,000.00, and on the other hand, the Board's attorneys say it is $100,000,000.00 or more. As appears *infra*, when the purpose was "rate base" the Railroad valued its entire system at $92,663,853, on the basis of investment cost, and at $110,382,795 on the basis of cost of reproduction.

█ Since on the common law writ of *certiorari* the judicial function is "supervisory" rather than "appellate" (*State ex rel.* v. *Hunt*, 137 Tenn. 243, 250, 251, 192 S. W. 931), there is under the writ no review of the intrinsic correctness of the Board's assessment. On the record as we have it, the following might have been written of the action of the Board in the present case:

"The petition charges that the board of equalization acted illegally, beyond its jurisdiction, arbitrarily, and

discriminatorily, but the only specification is that, while the board of equalization appraised other property in the city of Knoxville at its cash value, it appraised the property of the petitioner at $18,000 in excess of its cash value. No fraud is charged against the board of equalization, nor does it appear that in its procedure that body has disregarded any statutory provisions, except that the petitioner charges that the constitutional and statutory provisions that all property should be assessed equally and at its value were ignored as to petitioner's property.

 Obviously, therefore, the petition is merely an effort to have the courts review, upon petition for *certiorari,* the valuation placed upon the property for purposes of taxation by the duly constituted taxing authorities. Nothing is better settled in this jurisdiction, and everywhere we believe, than that the courts will not undertake such a review, nothing else appearing. As said in the cases, value is a matter of opinion, and the opinion of the courts is not likely to be any better than the opinion of tribunals specially created to fix property values. It is competent for the Legislature to provide that the findings of such tribunals shall be final so long as they act within their jurisdiction, observe statutory requirements, and there is no fraud.'' *W. J. Savage Co.* v. *Knoxville,* 167 Tenn. 642, 643, 644, 72 S. W. (2d) 1057.

Since its delivery by GREEN, C. J., this opinion has been so frequently cited and approved that it is one of the monuments of our State law.

As the Railroad has accepted the assessment of its Tennessee localized property at $3,469,994, the only question presented is the propriety of the assessment of its Tennessee distributable property at $31,885,680.

A summary of the essential elements of the Board's assessment is as follows:

Entire system valuation ...........$49,606,804

Entire system localized property ... 6,094,637

Entire system distributable property 43,512,167

73.28% of the entire system is in Tennessee. Therefore, the value of Tennessee localized property is $3,469,994. The value of Tennessee distributable property is $31,886,680, making the total assessment (less the legal exemption of $1,000) $35,355,674.

 Since in the present case there is no dispute that the Railroad's Tennessee properties are 73.28% of its entire system, we may consider the value of the entire system and reach the value of the Tennessee properties by a simple calculation. A railroad is to be assessed as a railroad by taking into consideration the elements of value specified in Code sec. 1526, and "other evidence which enables the Commission to fix the actual value of the railroad." *Browning Case*, 176 Tenn. 245, 254, 255, 140 S. W. (2d) 781.

 In view of the Railroad's insistence (quoted *supra* in this opinion as averment of illegality (2) ) that there was no evidence to support or establish the assessment, it is proper for us to consider the value of the entire system of the Railroad as it may have been reached by the Commission, considering elements of value set out in Code sec. 1526, and such "other evidence" Code sec. 1526, and other methods of appraisal as are generally accepted *Taylor* v. *Louisville & N. R. Co.*, *supra*, 88 F. at page 361.

 (a) From the evidence of the Railroad's book value as shown by its balance sheet of December 31, 1944, which was before the Commission, deducting "unad-

justed credits," and adding capitalized value of leased lines, (these adjustments being in approximately the same amount of $16,000,000) the entire system valuation on December 31, 1944, was $83,575,596. The ratio of the questioned assessment is 59.3% of that amount.

(b) A nationally recognized authority, Moody's Steam Railroads for 1945, was proved to be such authority and introduced before the Commission. From the statistics on the N. C. & St. L. R. R., as they appear in that work, the average system valuation of the Railroad for the years 1941 through 1944, is $68,303,894. The ratio of the questioned assessment is 72.6% of that amount.

(c) For the purpose of fixing rate base, the Railroad made certain returns to the Interstate Commerce Commission, as appears from "Docket #29037, Tenn., Intrastate Fares," December 2, 1943, from which it appears that as of January 1, 1940, the Railroad's properties in common carrier service were worth $92,663,853 if valued on the basis of investment cost, and these same properties were worth $110,382,795 if valued on the basis of reproduction cost. In making the assessment, it was proper for the Board to consider these figures (Code 1534). It further appears that the value of these properties had, in 1945, increased appreciably since January 1, 1940, on account of large sums spent by the Railroad in capital investment, maintenance and improvement in the years intervening between January 1, 1940 and July 1, 1945. The ratio of the disputed assessment is 53.5% of $92,663,953 and 47% of $105,985,801.

(d) If in application of Code sec. 1526, the entire system value be fixed by capitalization of the average net operating revenues of the Railroad for the three years, 1941 through 1944, prior to the assessment, that value

would be $95,865,354 upon a rate of return of 4.64%. The ratio of this figure to the questioned assessment is 51.7%.

Evidence to support all four of the foregoing calculations was before the Commission and the Board. No one of them was a formula prescribed by the Legislature for exclusive use by the Commission in arriving at the value of the Railroad for assessment, but the Commission might in its discretion, use one or all and still be within legislative bounds.

■■■ Of course the Railroad introduced other testimony by which it undertook to establish the fact that the value of the Railroad was much less than that established by the foregoing calculations. However, as the case is here on *certiorari* it is no part of our function to reweigh the evidence From the foregoing calculations of the entire system valuation as based on book value, the Railroad's own report to Interstate Commerce Commission and the capitalization of its average net earnings for the three years prior to the assessment, it is clear that there was material evidence to support the action of the Board (*Tennessee Cartage Co., Inc.*, v. *Pharr*, 184 Tenn. 414, 199 S. W. (2d) 119), and that its action in fixing value was neither arbitrary nor illegal.

■■ (3) Finally, the Railroad charges that the assessment by the Board was so excessive as to constitute constructive fraud. A charge of constructive fraud or fraud in law is insufficient to support judicial review by the Courts of Tennessee. Constructive fraud is an elusive creature of equity characterized by an absence of *intent*. In the *Browning Case*, 176 Tenn. at page 253, 140 S. W. (2d) at page 784, this Court clearly and definitely adopted the rule as it was stated in two cases from the Supreme Court of the United States, as follows:

"There must be something that amounts to *an intention, or the equivalent of fraudulent purpose,* to disregard the fundamental principle of uniformity." *Rowley* v. *Chicago & N. W. R. Co.,* 293 U. S. 102, 55 S. Ct. 55, 59, 79 L. Ed. 222. (Italics ours.)

"It is not enough, in these cases, that the taxing officials have merely made a mistake. It is not enough that the court, if its judgment were properly invoked, would reach a different conclusion as to the taxes imposed. There must be clear and affirmative showing that the difference is an *intentional discrimination* and one adopted as a practice." *Chicago G. W. R. Co.* v. *Kendall,* 266 U. S. 94, 45 S. Ct. 55, 57, 69 L. Ed. 183, 189. (Italics ours.)

"There is no claim of want of jurisdiction, or of illegality in procedure; and, as before said, the charge of fraud, 'in legal effect', comes down, upon analysis, to the insistence that the evidence of fair value afforded by the showing of the purchase price should have been accepted by the Board and that its failure so to do amounted 'in effect' to fraud.

"While the discrepancy shown in this case between the sale or purchase price and the assessment is very large, we are unable to see that the issue thus presented does not involve the merits, does not require that the judgment,—really opinion,—of the Court shall be substituted for that of the Board to whose discretion the question is by law delegated." *Treadwell Realty Co.* v. *City of Memphis,* 173 Tenn. 168, 174, 116 S. W. (2d) 997, 1000.

Finally, the Railroad complains that the Commission made an inspection of Railroad property with a view to its assessment and did not reduce the results of their inspection to writing. To support the objection the

Railroad cites *Louisville & N. R. Co.* v. *Bate*, 80 Tenn. 573, and Code sec. 1523. The *Bate Case* furnishes no authority, whatever, for the objection because it was decided in 1883, long before the creation of the Railroad & Public Utilities Commission in 1897, and was a construction of statutes which are no longer the law. Section 1523 of the Code was passed as part of Chapter 3 of the Public Acts of 1909, and was not the statute under review in the *Bate Case.* In the present case, when asked if the inspection trip had influenced his idea of values, the Chairman of the Commission replied that it had. When asked if he had reduced the results of his inspection to writing he replied, ''Certainly the records of the Commission, the Minute Books which we keep, which are also our books on localized distributable property, reflect the results of our investigation.''

The clear inference from this language is that the result of the inspection had been carried into the minutes of the Commission. This took place at the assessment hearing before the Commission. The Railroad had a full right to cross-examine the Commissioners about the inspection at the hearing *de novo* before the Board. The basis of the decision in the *Bate Case, supra,* was that the Railroad had been deprived of its right of cross-examination. There was no such deprivation of right here.

In view of our disposition of the case we have found it unnecessary to consider the assignments of error *seriatim.* We pursued this course not only because of the peculiar state of the record, but because of the fact that the Trial Judge gave no reasons for the actions which he took in overruling the motion to dismiss the *certiorari,* and in later entering a judgment declaring the assessment illegal. For the reasons heretofore given we

think the assessment was in all respects regular and according to law, and that there is no showing of any arbitrary or illegal action on the part of the Board of Equalization or of the Commission. The action of the Trial Judge in overruling the motion to dismiss the petition for *certiorari* is reversed, the motion to dismiss is sustained, and the petition for *certiorari* is dismissed at the cost of the Railroad. (Code 9051).

Neil, C. J., dissents.

I dissent from the majority opinion in this case for the same reason and upon the same grounds as set forth in my dissenting opinion in *Jim McCord* v. *Southern Railway Company* this day decided, p. 271 *supra*.