The STATE OF TENNESSEE et al.

v.

LOUISVILLE & NASHVILLE RAIL-
ROAD COMPANY et al.

No. 79–3025.

United States District Court,
M. D. Tennessee,
Nashville Division.

Aug. 15, 1979.

Everett H. Falk, Deputy Atty. Gen., Eugene W. Ward, John P. Long, Nashville, Tenn., for plaintiffs.

Harlan Dodson, Jr., Tyree B. Harris, III, Nashville, Tenn., Mary A. McReynolds, Washington, D. C., Robert C. Moore, Louisville, Ky., James W. McBride, William C. Antoine, Washington, D. C., Everett B. Gibson, Gregory G. Fletcher, Memphis, Tenn., for defendants.

## MEMORANDUM

WISEMAN, District Judge.

Plaintiffs, the State of Tennessee, the Public Service Commission of Tennessee and three individual members thereof, the State Board of Equalization of Tennessee and seven individual members thereof, and the Metropolitan Government of Nashville and Davidson County, Tennessee (hereinafter referred to collectively as the "State"), filed their complaint in this Court seeking a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act), 49 U.S.C. § 11503,[1] (hereinafter referred to as "section 306") is compatible with Tennessee's property tax classification system as set out in T.C.A. § 67–601.[2] In the alternative, the State seeks a declaratory judgment that section 306 is unconstitutional on the grounds that Congress exceeded its power under the Commerce Clause, art. 1, § 8, cl. 3, as limited by the Tenth Amendment to the United States Constitution or because Congress lacked a rational basis for enacting section 306 and failed to select a reasonable and appropriate means of implementing the goals of the 4R Act.

The defendants, Louisville & Nashville Railroad Company and sixteen other railroad companies (hereinafter referred to col-

[1.] The Railroad Revitalization and Regulatory Reform Act of 1976 has been codified at 45 U.S.C. §§ 801–854. Section 306, designed to implement the congressional purposes of this Act, was codified at 49 U.S.C. § 26c (1976). In 1978 § 26c was repealed and revised without substantive changes becoming 49 U.S.C. § 11503.

[2.] The particular classifications in issue are the public utility property classification and the industrial and commercial property classifica-

tion. T.C.A. § 67–601(7) defines public utility property to include, inter alia, railroad companies, telephone and telegraph companies, power companies, gas companies, and taxicab, transit and limousine companies.

T.C.A. § 67–601(8) defines industrial and commercial property to include, inter alia, all property used for business and all real property used for dwelling purposes containing two or more rental units.

lectively as "Railroads")[3] and the United States counterclaim seeking a declaratory judgment that Tennessee's property tax classification system violates the provisions of section 306, that section 306 is a valid and constitutional act of Congress, and that section 306 is in full force and effect from and after February 5, 1979, and is, therefore, applicable to Tennessee's assessment of transportation property for the 1979 Tennessee tax year.

Both the defendant Railroads and the defendant United States have filed motions for summary judgment. Oral arguments were heard on these motions on June 25, 1979.

## TENNESSEE'S CONTENTION THAT SECTION 306 IS COMPATIBLE WITH THE STATE'S PROPERTY TAX CLASSIFICATION SYSTEM AND DOES NOT ABROGATE T.C.A. § 67–601.

■ The State maintains that basic principles of statutory construction mandate that section 306 of the 4R Act does not abrogate Tennessee's property tax classification system. In support of this contention the State relies upon a comparison of the definition of commercial and industrial property as defined in section 306 as opposed to T.C.A. § 67–601(8).[4] This comparison reveals that section 306's definition of commercial and industrial property encompasses commercial transportation property which is included under Tennessee's public utility property classification.[5] On the basis of section 306's more inclusive definition of commercial and industrial property and that section's definition of assessment meaning "valuation for purposes of a property tax levied by any taxing district," the

State contends that subsection (1)(a) of section 306 merely prohibits states from discriminating against railroad property in terms of valuation for property tax purposes as opposed to *all other* property devoted to commercial or industrial use. Thus, because Tennessee's public utility property classification includes railroad property in addition to other property defined as commercial and industrial property under section 306, all of which are taxed at a higher tax ratio, Tennessee is not singling out railroad property for discriminatory tax treatment.

This construction of section 306, the State argues, is also consistent with the congressional intent underlying the federal statute as evidenced by the 1961 Report of the Senate Committee on Interstate and Foreign Commerce on National Transportation Policy, S.Rep.No.445, 87th Cong., 1st Sess. (hereinafter referred to as the "Doyle Report"), a study which focused on the problems of transportation on a national scale with particular emphasis on railroad transportation. The Doyle Report proposed an antidiscrimination tax bill which would protect all common carriers engaged in interstate commerce by insuring that "such carriers would receive equal treatment with other taxpayers subject to the same tax rates *in accordance with applicable State law*" (emphasis in original). Doyle Report at 466. This Court believes, however, that whatever support Tennessee's arguments afford in determining the effect of section 306 upon Tennessee's tax classification system is invalidated by the congressional statements made during the debates pre-

---

**3.** These companies include: Louisville & Nashville Railroad Company; Clinchfield Railroad Company; Southern Railway Company; Alabama Great Southern Railroad Company; Central of Georgia Railway Company; Cincinnati, New Orleans and Texas Pacific Railway Company; Tennessee, Alabama and Georgia Railway Company; Tennessee Railway Company; Illinois Central Gulf Railroad Company; Missouri Pacific Railroad Company; St. Louis-San Francisco Railway Company; East Tennessee and Western North Carolina Railroad Company; Corinth and Counce Railroad Company; St. Louis Southwestern Railway Company;

Chattanooga Station Company; Arkansas and Memphis Railway Bridge and Terminal Company; and Chicago, Rock Island and Pacific Railroad Company.

**4.** Section 306 defines commercial and industrial property as "property, other than transportation property and land used primarily for agricultural purposes or timber growing, devoted to a commercial or industrial use and subject to a property tax levy." 49 U.S.C. § 11503(a)(4).

**5.** *See* note 2 *supra.*

ceding the passage of section 306 in which both Senator Howard Baker and Representative Robin Beard of Tennessee attempted to amend the 4R Act in order to exempt from the Act's coverage states having a reasonable classification of property for state purposes. When the 4R Act came before the Senate for a final vote, Senator Baker stated in opposition to section 306, "By failing to include my amendment, therefore, the bill's section on state taxation of transportation property will require the State of Tennessee to reduce the level of assessments of railroads and other interstate carriers from 55 percent to 40 percent." 121 Cong.Rec.S–23043 (daily ed. Dec. 19, 1975). The subsequent enactment of the bill without the requested amendment leaves no doubt but that the federal law would serve to abrogate Tennessee's classification scheme.

TENNESSEE'S CONTENTION THAT SECTION 306 OF THE RAIL REVITALIZATION REGULATORY REFORM ACT REPRESENTS AN IMPERMISSIBLE EXERCISE BY CONGRESS OF ITS POWER UNDER THE COMMERCE CLAUSE.

The State asserts in the alternative that, should this Court construe the enactment of section 306 as an abrogation of Tennessee's property tax classification system thereby requiring the State to reduce the level of assessment and taxation of railroad property to that of its commercial and industrial classification, such abrogation must be deemed an impermissible exercise by Congress under the Commerce Clause. In maintaining this argument, however, the State has taken cognizance of the plenary power of Congress to control state laws for the regulation of interstate commerce as established in the leading case of Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). The State also recognizes that the broad power of Congress to regulate commerce extends to private activities to the exclusion and preemption of state law regulating the same conduct. Heart of Atlanta Motel v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). The plaintiff in

Heart of Atlanta Motel, a motel owner, refused to rent rooms to Negroes in violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a. The plaintiff challenged the constitutionality of the Civil Rights Act arguing that Congress had exceeded its authority to regulate commerce under the Commerce Clause. The Supreme Court, however, refuted this contention stating that,

[T]he power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce. One need only examine the evidence which we have discussed above to see that Congress may—as it has—prohibit racial discrimination by motels serving travelers, however 'local' their operations may appear.

379 U.S. at 258, 85 S.Ct. at 358, 13 L.Ed.2d at 269.

Prior to the Heart of Atlanta Motel decision, the plenary power of Congress to regulate commerce had been more dramatically established in Wickard v. Filburn, supra, in which a federal prohibition against the unlicensed growing of wheat was held valid as applied to a small Ohio farmer who produced 239 bushels for on-farm consumption without federal authorization. The Court's holding in Wickard was based on the conclusion that even local activity may be regulated by Congress should such activity exert a substantial economic effect on interstate commerce whether direct or indirect. 317 U.S. at 125, 63 S.Ct. at 89, 87 L.Ed. at 135.

While recognizing that the power of Congress to regulate interstate commerce is plenary under the Commerce Clause, the State is also aware that the Commerce Clause itself imposes certain restrictions on the states in the area of taxation. These restrictions are enunciated in Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959), wherein the Supreme Court held

that a state cannot impose taxes on itinerants and a state cannot tax the privilege of engaging in interstate commerce either by providing a direct commercial advantage to local business or by subjecting interstate commerce to the burden of "multiple taxation." The Court explained that such impositions by the states under the Commerce Clause are not allowed because they interfere directly with the free flow of commerce.

Additionally, the Railroads have cited four cases in support of the proposition that the power of Congress under the Commerce Clause includes the power to control state taxation affecting interstate commerce. These cases were relied upon in the recent decision of *Arizona v. Atchison, Topeka & Santa Fe R. R. Co.,* No. 78–655 (D.Ariz. Jan. 26, 1979), in which the Arizona district court addressed the issue of whether section 306 was constitutional in light of the Tenth Amendment's reservation of certain powers to the states and the broad powers given Congress under the Commerce Clause. Determining that section 306 was constitutional, the Arizona court cited *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978). In *Moorman,* the plaintiff, an Illinois corporation which sold its products in Iowa, challenged the constitutionality of Iowa's single-factor sales formula as opposed to the three-factor formula employed by most states for apportioning an interstate corporation's income for state income tax purposes. The Illinois corporation claimed that the single-factor formula resulted in duplicative taxation of income and that, to the extent that the overlap in taxation was permitted, a corporation engaging in interstate business shouldered a tax burden not shared by solely intrastate businesses. The Court, however, declined to invalidate the Iowa statute establishing the single-factor formula, reasoning that the imposition of national uniform rules for the division of income would not reflect the national interest "because the interests of those States whose policies are subordinated in the quest for uniformity would be excluded from the calculation." *Id.* at 280, 98 S.Ct. at 2348, 57 L.Ed.2d at 209. On the other hand, the Court did indicate that Congress was empowered to establish uniform rules of apportionment by stating that the "legislative power granted to Congress by the Commerce Clause of the Constitution would amply justify the enactment of legislation requiring all states to adhere to uniform rules for the division of income. It is to that body, and not this Court, that the Constitution has committed such policy decisions." *Id.*

The second case which the Railroads cite holding that Congress under the Commerce Clause can control state taxation is *State Board of Insurance v. Todd Shipyards Corp.,* 370 U.S. 451, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962). The plaintiff in this decision challenged the constitutionality of a Texas statute which imposed a tax on insurance premiums paid out-of-state on out-of-state contracts covering risks within the state. The Court held that the Texas statute was invalid and subordinate to the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., which precluded a state from taxing contracts of insurance or reinsurance entered into outside its jurisdiction by individuals or corporations resident or domiciled therein covering risks within the state. In so ruling, the Court referred to the principle that "[t]he power of Congress to grant protection to interstate commerce against state regulation or taxation . . . or to withhold it . . . is so complete that its ideas of policy should prevail." *Id.* at 456, 82 S.Ct. at 1384, 8 L.Ed.2d at 624 (citations omitted). However, in a footnote to this statement, the Court qualified the above principle by citing *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946), wherein the Court, in reference to the plenary scope of power given to Congress under the Commerce Clause, stated that:

That power [power of Congress over commerce] does not run down a one-way street or one of narrowly fixed dimensions. Congress may keep the way open, confine it broadly or closely, or close it entirely, subject only to restrictions placed upon its authority by other consti-

tutional provisions and the requirement that it shall not invade the domains of action reserved exclusively for the states. *Id.* at 434, 66 S.Ct. at 1157, 90 L.Ed. at 1362.

Thirdly, the Railroads cite *Hooven & Allison Co. v. Evatt,* 324 U.S. 652, 65 S.Ct. 870, 89 L.Ed. 1252 (1945), in which the petitioner, an importer of hemp and other fibers from the Philippine Islands, protested Ohio's taxation of the fibers which had been stored in plaintiff's warehouse prior to their manufacture. The Court held that the goods were immune from state taxation under the import clause, art. 1, § 10, cl. 2 of the United States Constitution, based upon the policy of protecting national commercial relations. When confronted with the state's argument that the goods did not qualify as imports in that they were not brought into the United States from a foreign country, the Court responded, "Congress through the commerce clause, possesses the same power of control of state taxation of all merchandise moving in interstate or foreign commerce." *Id.* at 679, 65 S.Ct. at 883, 89 L.Ed. at 1271.

Fourthly, the Railroads refer to *Northwest Airlines, Inc. v. Minnesota,* 322 U.S. 292, 64 S.Ct. 950, 88 L.Ed. 1283 (1944), in which the Court grappled with the problem of whether Minnesota, as the domiciliary state of plaintiff corporation, was constitutionally limited in levying a personal property tax on the fleet of airplanes owned and operated by the corporation in interstate transportation. The Court concluded that Minnesota, as the home state, was empowered to tax all movables that came within it except for property that had been permanently situated within another state during the entire tax year. The Court asserted that Congress could exert its controlling authority over commerce by appropriate regulation and exclude a domiciliary state from the authority which it otherwise would have because it is the domiciliary state. In addition, Justice Jackson, in his concurring opinion, recognized the extent of federal control over air transit in the area of its privileges, rights, and protection. In this context, he stated that constitutionally

Congress could exact a single uniform tax on the property or the business to the exclusion of state taxation.

Although in the present case the State concedes that the Commerce Clause gives Congress broad powers to regulate interstate commerce and prohibits state taxation which discriminates against interstate commerce, the State argues that Tennessee is permitted to tax property used in interstate commerce where the property is permanently located or commonly used in the taxing state. *Pullman Co. v. Richardson,* 261 U.S. 330, 43 S.Ct. 366, 67 L.Ed. 682 (1923). Upon this premise the State maintains that Tennessee's taxation of railroad property within its boundaries is a legitimate exercise of its sovereign power. Moreover, the State asserts that its means of taxing railroad property within its boundaries is just and reasonable under the Commerce Clause and the Fourteenth Amendment. In support of this assertion, the State argues that Tennessee's tax classification system is applied to an activity with a substantial nexus with Tennessee and its political subdivisions, is fairly apportioned, does not discriminate against or unduly burden interstate commerce, is not confiscatory and complies with the due process and equal protection requirements of the Fourteenth Amendment. Furthermore, the State cites *Louisville & Nashville R. R. Co. v. Atkins,* 390 F.Supp. 576 (M.D. Tenn.1975), in which this Court upheld Tennessee's classification of railroads as public utility property despite claims that such classification by the Tennessee legislature was arbitrary and unreasonable and, therefore, in violation of the Fourteenth Amendment to the Constitution. It is noteworthy that the plaintiff in *Atkins* asserted that the financial change of conditions in the railroad industry rendered invalid the factual basis of the Supreme Court's statement in *Nashville, Chattanooga & St. L. Ry. Co. v. Browning,* 310 U.S. 362, 368, 60 S.Ct. 968, 972, 84 L.Ed. 1254, 1257 (1940):

> That the states may classify property for taxation; may set up different modes of assessment, valuation and collection; may tax some kinds of property at higher

rates than others; and in making all these differentiations may treat railroads and other utilities with that separateness which their distinctive characteristics and functions in society make appropriate— these are among the commonplaces of taxation and of constitutional law.

In light of the change of circumstances which adversely affected the railroads in *Atkins,* this Court, nevertheless, held that the plaintiff must show that the changed circumstances had rendered Tennessee's classification of railroads as public utilities invidiously discriminatory which the plaintiff had not done. In reaching this conclusion, the Court cited *Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 526–27, 79 S.Ct. 437, 440–441, 3 L.Ed.2d 480, 484 (1959), wherein the Supreme Court stated that:

> The States have a very wide discretion in the laying of their taxes. When dealing with their proper domestic concerns, and not trenching upon the prerogatives of the National Government or violating the guaranties of the Federal Constitution, the States have the attribute of sovereign powers in devising their fiscal systems to ensure revenue and foster their local interests. . . . The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. . . To hold otherwise would be to subject the essential taxing power of the State to an intolerable supervision, hostile to the basic principles of our Government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to assure.

Thus, having submitted that Tennessee's property tax classification system is both permissible as a valid exercise of state sovereignty under the Commerce Clause and is constitutional according to *Browning, supra,* and *Atkins, supra,* the State argues that section 306 does not preempt its tax classification scheme.

The State also contends that the broad powers given Congress under the Commerce Clause to regulate interstate commerce are limited by the Tenth Amendment. *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). In *National League of Cities* the Supreme Court held that the 1974 amendments to the Fair Labor Standards Act extending the Act's minimum wage and hour provisions to the states were not within the authority granted to Congress by the Commerce Clause. In making this determination the Court looked to the relationship of that activity to the purpose of state government instead of considering whether an activity undertaken by a state falls within the realm of commerce. Speaking through Justice Rehnquist, the Court acknowledged that employment activities of a state fall within the broad definition of commerce but concluded that the Tenth Amendment's protection of state sovereignty embodied an affirmative limitation which could render the commerce power invalid when such power was applied to the states as states. Support for this holding was found in the intergovernmental tax immunity cases as well as a declaration taken from a footnote in *Fry v. United States,* 421 U.S. 542, 547, 95 S.Ct. 1792, 1796, 44 L.Ed.2d 363, 369 (1975), that the Tenth Amendment prohibits Congress from exercising its power in a manner "that impairs the States' integrity or their ability to function effectively in a federal system." In order to determine when a state activity is protected from federal regulation emanating from the commerce power, the Court focused on the nature of the state activity and whether it was traditionally an essential function of state government. Under this one-dimensional state interest test, the regulation of wages and hours for public employees was deemed a primary function of the states as sovereign governments not to be displaced by federal legislation. Tennessee contends that in the present case, the State has exercised its sovereign power in providing for the taxation of railroad company properties as a public utility within the state. In view of the holding in *National League of Cities,* the State maintains that Congress by enacting section 306 exceeded the limitations of the Tenth Amendment which according to at least

four Justices stands as a restraint on congressional power under the Commerce Clause.

Justice Blackmun's brief concurring opinion in *National League of Cities,* however, interpreted the analysis of the majority as a balancing approach and in his estimate the states' interest in sovereignty rightly tipped the scale. Use of this analysis enabled him to suggest that in the area of environmental protection, for example, federal regulation ought to be tolerated because the national interest is greater than that of the states. Since Justice Blackmun's concurrence was the swing vote in the ultimate holding of *National League of Cities,* it is impossible to discern what test, if any, was established for analyzing congressional exercises of power pursuant to the Commerce Clause. Therefore, this Court looks to the judicial tests employed prior to *National League of Cities* and as seen in the recent cases of *Arizona Pub. Serv. Co. v. Snead,* 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979) and *Arizona v. Atchison, Topeka & Santa Fe R. R. Co.,* No. 78–655 (D.Ariz. Jan. 26, 1979).

■ When confronted with the plaintiff's contention that the holding in *National League of Cities* renders section 306 unconstitutional on the ground that Congress impermissibly exceeded its authority under the Commerce Clause to enact such legislation, the Court in *Santa Fe* employed a balancing of federal and state interest test similar to that used by the Supreme Court in *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), and implicitly in *National League of Cities v. Usery, supra,* at 856, 96 S.Ct. at 2476, 49 L.Ed.2d at 260 *(Blackmun,* J. concurring). In *Southern Pacific* the United States Supreme Court stated that, "Congress has undoubted power to redefine the distribution of power over interstate commerce. It may either permit the states to regulate commerce in a manner which would otherwise not be permissible . . . or exclude state regulation even of matters of peculiarly local concern which nevertheless affect interstate commerce." *Id.* 325 U.S. at

769, 65 S.Ct. at 1520–1521, 89 L.Ed. at 1925. The Supreme Court, however, did not disregard the burden which a state regulation imposes on interstate commerce but rather examined the nature and extent of such burden in addition to comparing the relative weights of the state and national interests involved. In *Santa Fe* the Court weighed the state's interest in a discriminatory tax classification system against the federal interest in eliminating or reducing discriminatory taxation of railroad property in an effort to revitalize the railway industry. On balance, the Court concluded that the federal interest was superior and that section 306, as the defendants in the present case contend, did not directly dictate to the states how essential decisions concerning integral government functions should be made. This conclusion was premised on the reasoning that under section 306, the states are free to collect the same amount of revenue by means other than a property tax scheme which discriminates against railroad companies and that a restriction on a state's means of tax collection did not directly or significantly affect state policy choices. This Court also concludes that Congress' effort to revitalize the railroad industry by implementing the 4R Act overrides the State's interest in maintaining a property tax classification system and, therefore, section 306 passes the balancing test used in *Santa Fe.*

In *Arizona Pub. Serv. Co. v. Snead, supra,* the state tax which was in issue was imposed by New Mexico on all companies generating electricity within the state. The effect of the tax was to discriminate against out-of-state consumers in violation of the Tax Reform Act of 1976, 15 U.S.C. § 391. The Supreme Court, in response to New Mexico's contention that the Tax Reform Act exceeded the permissible bounds of congressional action under the Commerce Clause, stated that:

In view of the broad power of Congress to regulate interstate commerce this argument must be rejected. Here, the Congress had a rational basis for finding that the New Mexico tax interfered with in-

terstate commerce, and selected a reasonable method to eliminate that interference. The legislation thus was within the constitutional power of Congress to enact. *Id.* 441 U.S. at 148, 99 S.Ct. at 1634. The question of whether section 306 also passes the above rational basis test espoused in *Snead* is discussed in relation to the third contention raised by the State.

## THE STATE'S CONTENTION THAT SECTION 306 IS ARBITRARY, INAPPROPRIATE, AND WITHOUT A RATIONAL BASIS.

■ Apart from the alleged Tenth Amendment limitations on the exercise of congressional power under the Commerce Clause, the State maintains that section 306 fails the traditional two-part test of determining the constitutionality of federal legislation under the Commerce Clause as expressed in *Hewlett-Packard Co. v. Barnes,* 425 F.Supp. 1294 (N.D.Cal.1977), citing *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 258–59, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and in *Snead, supra.* Under this test Congress must have a rational basis to find that an activity affects interstate commerce and if Congress has such a basis, it must select a reasonable and appropriate means of eliminating the detrimental effect that such activity has on interstate commerce. This test stems from the guiding principle for congressional action set forth by Chief Justice John Marshall in *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819): "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited but consist with the letter and spirit of the constitution, are constitutional."

■ The first facet of this rational basis test, whether a certain end is within the scope of the commerce power or affects commerce as amplified by the Necessary and Proper Clause, art. 1, § 8, cl. 1 of the United States Constitution,[6] has been tested by two means constructed by the Supreme Court. The now obsolete "direct" and "indirect" distinction provided that only activities with "direct" effects on interstate commerce were within the commerce power. This test was replaced by the broader test of "substantial economic effect" on interstate commerce under which a rational basis has been found where the complete range of the wheat industry was being regulated;[7] where discrimination by restaurants could have a substantial effect on commerce;[8] and where extortionate credit transactions, viewed as a class, were seen to affect interstate commerce, including interstate crime.[9] In light of this broad substantial economic effect test, this Court finds that Tennessee's property tax classification system under which railroads are classified as a public utility "affects" interstate commerce.

The second facet to be examined under the rational basis test is whether the legislative means selected are appropriate. The State maintains that section 306 does not represent a reasonable and appropriate means of regulation to accomplish the removal of discrimination in property taxation because the statute singles out railroad property for discriminatory tax treatment favorable to railroads to the exclusion of other public utilities. Thus, it is asserted that section 306 is in essence a legislatively mandated state subsidy for railroads. As support for this proposition, the State cites *Metcalf v. Mitchell,* 269 U.S. 514, 46 S.Ct. 172, 384 70 L.Ed. (1926) and *New York v. United States,* 326 U.S. 572, 66 S.Ct. 310, 90

---

**6.** The Necessary and Proper Clause states that, "[t]he Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;"

**7.** *Wickard v. Filburn, supra.*

**8.** *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).

**9.** *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

L.Ed. 326 (1946) (Rutledge, J., concurring). In *Metcalf,* the Court held that the plaintiff consulting engineers employed by the state to assist in state projects were not exempted from federal income taxation. The State quotes a passage from this case asserting that the limitation on the taxing power of the state and federal government "cannot be so varied or extended as seriously to impair either the taxing power of the government imposing the tax . . . or the appropriate exercise of the functions of the government affected by it . . . ." *Id.* 269 U.S. at 524, 46 S.Ct. at 174–175, 70 L.Ed. at 392 (citations omitted). From this authority, the State alleges that section 306 seriously interferes with the sovereign taxing powers of the states in order to achieve the end of alleviating the railroad companies' financial woes. In response to this contention, however, this Court believes that it can be asserted with equal force that Tennessee's taxation of railroads at a higher rate than properties within its commercial and industrial classification seriously impairs the flow of interstate commerce, an appropriate concern of the federal government. Indeed, the Supreme Court in *New York v. United States, supra,* stated that the restriction upon states not to make laws that discriminate against interstate commerce is a vital constitutional principle. From this premise this Court refers to the cases cited by the defendants and the Court in *Santa Fe, supra,* indicating that the power of Congress under the Commerce Clause includes the power to control state taxation affecting interstate commerce. *Moorman Mfg. Co. v. Bair, supra; State Board of Ins. v. Todd Shipyards Corp., supra; Hooven & Allison Co. v. Evatt, supra;* and *Northwest Airlines, Inc. v. Minnesota, supra.* Furthermore, under the rational basis test the Supreme Court has stated that it would "certainly not substitute its judgment for that of Congress in such a matter [selecting a means of eliminating an activity having a detrimental effect on interstate commerce] unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent." *Stafford v. Wallace,* 258 U.S. 495, 521, 42 S.Ct. 397, 403–404, 66 L.Ed. 735, 743 (1922).

█ Thus in analyzing section 306 under the rational basis test, this Court finds that Congress did have a rational basis for determining that state property tax classification systems which assess railroad property at a higher rate than properties classified as commercial and industrial property "affects" interstate commerce. This Court also finds that Congress has selected a reasonable means by the enactment of section 306 of eliminating the adverse effects that such a state taxation scheme has on interstate commerce and will not substitute its judgment of what is a reasonable means for that of Congress.

## TENNESSEE'S CONTENTION THAT SECTION 306 OF THE 4R ACT, EVEN IF VALID, DOES NOT AFFECT PROPERTY TAX ASSESSMENTS IN TENNESSEE FOR THE 1979 TAX YEAR.

The State relies on T.C.A. § 67–603 to bolster its contention that section 306, if deemed to be valid, does not take effect in Tennessee until the 1980 tax year. T.C.A. § 67–603 mandates that all assessments of real and personal property are to be made annually as of January 1 for the year to which the assessment applies. The State argues, therefore, that although the process of making assessments occurs later in the year, section 306 has no impact on the current tax year since it did not become effective until February 5, 1979.

The defendants counter this argument from two standpoints. First, the defendants assert that T.C.A. § 67–603 was not intended to foreclose any legislative change in tax practices after January 1, citing *McCord v. Nashville, Chattanooga & St. Louis Ry.,* 187 Tenn. 277, 213 S.W.2d 196 (1948). In *McCord* the tax law was amended to require the biennial assessment of railroad property in the odd rather than the even years as previously established. In determining that the legislative change should be given immediate effect, the Tennessee Supreme Court looked to the legislative intent in enacting the amendment stating that:

Historical consideration of the practice established under former changes in the law is persuasive and justifies a conclusion that if by the amendments of 1945, the Legislature had wished to depart from the practice established under former amendments, it would have expressed an intention to do so. Since the creation of the Commission in 1897, there have been four changes in the year for making the biennial assessment of railroads, and in each of the four cases the change has been given effect immediately, and the assessment made and tax collected under the changed law in the year of its enactment by the Legislature.

187 Tenn. at 289–90, 213 S.W.2d at 202. The defendants contend that under Tennessee law, legislative modifications in assessment practices enacted or effective after the taxable date must be given application during that tax year unless the Legislature otherwise directs.

■■■ This Court concludes, however, as did the court in *Alabama Great So. R. R. Co. v. Eagerton*, 472 F.Supp. 60 (D.Ala. 1979), when confronted with the question of whether section 306 required a reduction in Alabama's assessment ratio for the 1979 tax year, that the intent of the Tennessee legislature is not helpful in construing a federal statute. This Court is persuaded, on the other hand, by defendants' second contention that the doctrine of federal supremacy requires that section 306 be given effect during the 1979 tax year. Under the Supremacy Clause of the United States Constitution, art. VI, cl. 2, a state statute can be preempted by a federal law. Among the state statutes subject to displacement are those which conflict with a valid federal statute, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), and those which stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). This Court has previously determined Tennessee's property tax classification system is in conflict with the mandates of section 306. Furthermore, an ex-

amination of the legislative history of section 306 reveals that the congressional purpose of delaying the effective date of that statute for a period of three years from the date of its enactment was to lighten any impact upon the states and local communities by spreading the burden over a term of several years and to afford state legislatures an opportunity to take whatever steps were necessary to come into compliance with that statute's requirements. This three year period expired February 5, 1979. As the defendants have stated, the Tennessee statutes under which the railroad property is assessed prescribe a timetable for yearly valuation and assessment. Under T.C.A. § 67–931, the Public Service Commission must complete its valuation and assessment of railroad property on or before the first Monday in August. Under T.C.A. § 67–933, the State Board of Equalization need not certify to the Public Service Commission the final and conclusive assessment of railroad property until the third Monday in October. It is not until February 28, 1980, that the taxes based on such assessments are required to be paid. To make section 306 applicable for the first time to the 1980 tax year for which taxes are not due until 1981, more than five years after the enactment of section 306, and more than two years after its effective date, is contrary to the three-year phase-in plan of Congress. Such a construction frustrates the congressional purpose in fixing the effective date of section 306. On the basis of the doctrine of federal supremacy, therefore, this Court concludes that the federal statute prohibiting tax discrimination against rail transportation property which became effective February 5, 1979, requires the State of Tennessee to reduce the assessment ratio for railroad property to the assessment ratio of other commercial and industrial property for the 1979 tax year.

TENNESSEE'S CONTENTION THAT NO INJUNCTIVE RELIEF CAN BE GRANTED UNDER SECTION 306 UNTIL ASSESSMENTS OF RAILROAD PROPERTY HAVE BEEN MADE.

The State maintains that under section 306(2)(c) a state must make its tax assess-

ment of railroad property before this Court can review such assessments for compliance with section 306. Only then, the State argues, can the Court determine whether the assessments are invalid and enjoin their levy and collection. It is contended that to grant injunctive relief prior to the making of assessments would confer upon the courts the power to assess and levy a property tax, a power which, according to *Moses Lake Homes, Inc. v. Grant County*, 365 U.S. 744, 81 S.Ct. 870, 6 L.Ed.2d 66 (1961), a federal district court does not have. In *Moses Lake*, the Court of Appeals for the Ninth Circuit agreed with the district court that the tax assessed by a county in the state of Washington against leasehold estates of lessees from the federal government was invalid because of its discriminatory nature. The Supreme Court determined that it was error for the appellate court to remand the case to the district court directing that court to decree a valid tax for an invalid one by reducing the tax to what it would have been had the tax been levied on a nondiscriminatory basis. Against this factual background, the Supreme Court stated that only the appropriate taxing officials may assess and levy taxes although the federal courts may declare such taxes to be void.

 Since Congress has expressly authorized federal courts to grant injunctive relief in furtherance of the express purposes of section 306, it is not required that irreparable harm or inadequacy of legal remedies first be shown. *United States v. City and County of San Francisco*, 310 U.S. 16, 30, 60 S.Ct. 749, 757, 84 L.Ed. 1050 (1940).

Therefore, having determined that section 306 is constitutional and is applicable to the 1979 Tennessee tax year, an assessment of railroad property by the State of Tennessee contrary to the terms of that statute must be enjoined. Unlike the district court in *Moses Lake*, this Court is not assessing a property tax by decreeing a valid tax for an invalid one. Instead, the Court is exercising its remedial powers granted under section 306 by enjoining the assessment of rail

transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property. Such a remedy is necessary to effectuate the congressional policy under the 4R Act.